736 So.2d 1004 (1999)
STATE of Louisiana
v.
Darnell LEWIS.
No. 97-KA-2854.
Court of Appeal of Louisiana, Fourth Circuit.
May 19, 1999.
Rehearing Denied August 16, 1999.
*1007 Harry F. Connick, District Attorney, Charles E.F. Heuer, Assistant District Attorney, New Orleans, Louisiana, Attorneys for Plaintiff-Appellee State of Louisiana.
Pauline F. Hardin, M. Richard Schroeder, Laurie L. Chess, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, Louisiana, Attorneys for Defendant-Appellant Darnell Lewis.
*1008 Court composed of Chief Judge ROBERT J. KLEES, Judge STEVEN R. PLOTKIN, Judge MOON LANDRIEU.
KLEES, Chief Judge.
Defendant Darnell Lewis was charged by grand jury indictment on May 23, 1991 with two counts of aggravated rape, violations of La. R.S. 14:42; two counts of aggravated burglary, violations of La. R.S. 14:60; and one count of aggravated crime against nature, violations of La. R.S. 14:89.1. Defendant entered pleas of not guilty at his June 4, 1991 arraignment. On October 1, 1991, the trial court denied a number of defense motions, including motions as to the two victims in the five crimes for which defendant was tried and which are the subject of this appeal. On June 5, 1992, the trial court denied defendant's first motion to sever. Again, on February 26, 1993, re-urged motion to sever was denied. Finally, on the morning of the first day trial, November 6, 1995, the court again denied the motion to sever.
On November 9, 1995, following trial by a twelve-person jury, defendant was found guilty as charged of two counts of aggravated rape and aggravated burglary, and one count of aggravated crime against nature. The trial court denied defendant's motion for new trial on August 25, 1997. On September 11, 1997, the trial court sentenced defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on each of the two counts of aggravated rape; thirty years at hard labor on each of the two counts of aggravated burglary; and ten years at hard labor on the single count of aggravated crime against nature. Defendant appeals this final judgment.

FACTS

Testimony regarding victim F.F.
Dr. Ross examined F.F., a sexual assault victim, at Charity Hospital during the early morning hours of January 6, 1991.[1] The victim reported that her assailant forced her to submit to cunnilingus, and then penetrated her with his penis both vaginally and anally. The victim related that her assailant held a knife near her throat, and also that he had tied her hands and legs together. Dr. Ross noticed several small red and purple areas on her right wrist, which he said were consistent with recent bruising, i.e., contusions. Dr. Ross could not recall whether the victim related that her assailant ejaculated, but noted that his report did not reflect that he had.[2]
F.F. testified that she was living at 2328 Gentilly Boulevard with her husband and two children on January 6, 1991. Her husband worked at a French Quarter establishment, from 7:00 p.m. to 2:00 a.m. She went to sleep around 7:30 p.m. that evening. She had not had anything to drink at dinner that evening. Her niece later brought the children home from an outing; she bathed them, and they all went to sleep about 10:30 p.m. The victim said she left the Christmas tree lights on in the front room, the television set was on in her bedroom, the next room of the "shotgun" residence, and a bathroom light was also left on, which was the next room down the hall from her bedroom. She awakened later when someone touched her. She saw a man standing by the side of her bed. He told her to turn over on her stomach and not to look around. She said she looked up and saw the man's face, for less than thirty seconds. The man was standing beside her bed naked except for a pair of white socks with a blue strip on the toe. He had "a lot of hair" in a jeri-curl type style. She said he was about six feet tall, weighed about one hundred and seventy-five pounds, and was about twenty-five years old. She also noticed he was wearing a gold ring with a black stone in it. She said the man cut *1009 her slip, bra and panties off with a knife. Then he raped her vaginally and anally, and also performed oral sex on her, all the time holding the knife on the side of her neck. She said the ordeal lasted for what seemed like thirty minutes. Afterwards, the man tied her hands and feet with her slip and bra, and told her that if she screamed or tried to get loose he would harm her children. She subsequently heard her daughter say "Stop." Alarmed, she wriggled free of her bindings, but found that her daughter was only talking in her sleep. The back door was wide open. She closed it, telephoned her sister to tell her she had been raped, and then called police.
Approximately six weeks later, Det. Lorenzo telephoned her to ask if he could show her some photographs. He came to her home and displayed some photographs to her. She said she picked out the man who raped her, defendant Darnell Lewis.
On cross-examination, the victim said that only the Christmas tree lights were onin the living room when she was awakened by defendant. The living room was adjacent to the victim's bedroom, as defense counsel characterized it during cross-examination: "Its' all sort of one continuous room?" To which the victim replied, "Yes, it is." The victim said she could not give an approximation of how long she viewed defendant, but she had said on direct examination that it was less than thirty seconds. She said she had never seen defendant before, and did not see him again until a court proceeding after his arrest. The victim could not explain why the police report reflected that her attacker urinated on her, and had ejaculated. She said he did not urinate on her, and that she did not think he ejaculated. Defense counsel brought out that the victim had not noticed a mole on defendant's face. She said the man who raped her was not wearing gloves. However, she also said she had not seen her attacker's clothes, except for the socks. On redirect examination, the victim stated that there was no doubt in her mind that defendant was the person who raped her.
New Orleans Police Officer Terry Thomas testified that he responded to the rape call in F.F.'s case on January 6, 1991. He said the victim gave a description of a black male, approximately six feet tall, weighing one hundred seventy-five pounds, with a medium jeri curl and dark complexion.
New Orleans Police detective Joseph Lorenzo, a rape section detective from 1987 to January 1995, testified that he investigated F.F.'s rape at 2328 Gentilly Boulevard on January 6, 1991. He said the rape occurred in the victim's bedroom, the second room of the double residence, and that there was no door between the first room, the living room, and the second room. He said a television set in the second room was on when he arrived, as well as an overhead light and the lights on a Christmas tree in the living room. He said a screen on the living room window had been cut and pulled away. He also stated that there were pry marks under the victim's bedroom window, as well as under the window of her children's bedroom, and said that the rear door had apparently been pried open. Det. Lorenzo subsequently conducted a photographic lineup wherein F.F. identified defendant as the man who raped her.
On cross-examination, Det. Lorenzo testified that the victim said her attacker was about twenty to twenty-five years old, clean-shaven, with black hair and a medium build. She said nothing about her attacker having a mole.
New Orleans Police Officer James Gahagan testified that he processed the scene of F.F.'s rape on January 6, 1991. He photographed the scene and collected bed sheets and clothing. He also checked for fingerprints but found none. A tire tool and a piece of iron were recovered, but he did not test them for fingerprints because the surfaces were not suitable for printing.

*1010 Testimony regarding victim G.N.
Dr. Wolfram Enseleit performed a rape examination on G.N. at Charity Hospital in the early morning hours of November 1, 1989, as reflected by his examination report.[3] G.N. gave a history of being vaginally raped, with some ejaculation, and reported that her anus had been digitally manipulated. She also reported that she had been punched in the face and chest, and choked. The victim had bruising and swelling around her right eye, swelling on the left side of her lip, some tenderness on her head and neck, and an abrasion on the fourth finger of her right hand, which, he said could be consistent with a bite. A pelvic examination revealed some secretions on the outside genitalia and some bruising around the opening of her vagina, inside of her vagina, and on her cervix. He saw redness around her anus, which could be consistent with digital penetration, but observed no tears or bleeding. A sample of secretions taken from G.N.'s vagina revealed the presence of sperm.[4]
On cross-examination, Dr. Enseleit testified that he wore gloves when performing such examinations, as did the nurses, but that they did not wear facemasks or hairnets. He said the gloves were not sterile, and that he had placed them on himself. Dr. Enseleit said he had no training on protecting evidence from contamination for later DNA testing at the time he conducted the examination of G.N. Dr. Enseleit said the victim told him that she had last had sexual intercourse on October 7, 1989, and that he did not expect her to have any semen present from that last intercourse.
G.N. testified that, on October 31, 1989, she was living with her daughter at 2333 Lafreniere Street, located in the Gentilly area. She and her daughter went to City Park for a Halloween outing. The victim came home alone, leaving her daughter with her best friend's family. She had just come back into town after a business trip. While getting her clothes ready for work the next day, the victim realized that her luggage was still in the trunk of her car. She went out to her car, and noticed a man coming down the driveway of the residence one house away. She said her driveway was on the right side of that particular house, and the driveway the man was walking in was on the left side of that same house. It was someone she had not seen before, but she thought he was a new neighbor. She said she made eye contact with the man, and believed she may have spoken to him, but could not be certain. It was nighttime, but the victim said a streetlight provided ample lighting in that area. The victim got her luggage and went back inside. She said she saw the man's face againwhen he was in her home.
When the victim got back inside, she went into the bathroom. She said she thought she heard a noise, and went to the front door, believing perhaps that some children were trick-or-treating. Seeing no one, she returned to the bathroom and took a bath. While in the tub, she again heard a noise, like a bump, and heard dogs barking. She got out of the tub, dried off, wrapped a towel around herself, and went to her bedroom to get her slippers. Returning from her bedroom, she noticed that her daughter's bedroom door was slightly open. She opened the door, turned on the light, and saw a man standing there with a pair of her daughter's underwear on his head. She had to look up at him, thus gauging his height. She screamed, and started fighting. She remembered heavy blows to her face, and said stockings the man had tied around his arms flew around in the air as they fought. She ran to the bathroom to get mace from her purse. The man followed, fighting her the whole way. In the bathroom, he *1011 tripped her, and she fell flat on her back. She said she still had not seen his face. As they fought in the bathroom, she tried to gouge out his eyes, but he raised his head so her hand hit his mouth, and he bit her. She said she remembered screaming, and looking up to see the man's face; the underwear was not there. The man started to choke her, to the point she thought she was dying. She said that all during the fighting the man was threatening her life, and said she begged for her life.
The man made the victim kneel, and put her elbows inside of the bathtub. He fondled her breasts, and inserted his finger into her rectum. He attempted to enter her vagina, but had no erection. She said he stimulated himself until he had an erection, and then he placed his penis into her vagina, where he ejaculated. The man tied her arms behind her back with the stockings. He turned off the bathroom light, and closed the door, telling her he would kill her if she hollered or said anything. She heard dogs barking outside, and assumed they were barking at the man as he left. She got up, wriggled free of her bindings, and called police. She said she described the man as approximately six feet tall, weighing around one hundred seventy, one hundred eighty, or one hundred ninety pounds, medium complexion, with a medium afro that "looked like maybe it had a curl at some time."
The next time she saw the man who raped her was on the midday television news on March 28, 1991. She called her boyfriend and then police. Later that evening, Det. Puigh and another detective came to her home and showed her a number of photographs. She identified defendant as the man who raped her.
On cross-examination, the victim stated that her recollection of her attacker's face is from the attack, when she saw him in the bathroom, not from when she saw the man outside. However, she said she remembered the brown sweater her attacker was wearing and said it was the same sweater worn by the man she saw outside shortly before she was attacked. The victim could not recall how long she viewed her attacker's face, but said it was longer than a split second. She could not remember if her hand was in his mouth when she saw his face. She could not recall whether the news report stated that the person shown had been charged with rape in Gentilly. She said she also viewed the news reports later during the day, after notifying police, but prior to being shown the photo lineup.
New Orleans Police Department Detective Len Fletcher testified that on October 31, 1989, he was assigned to the Fifth Police District, when he and his partner responded to a rape call in the 2300 block of Lafreniere Street at 9:57 p.m. Det. Fletcher said the victim, G.N., was disheveled, very upset, had a cut on her right hand, and was beginning to show signs of swelling about her face. Det. Fletcher broadcast a description of a black male, approximately six feet tall, weighing approximately one hundred and eighty pounds, with a brownish complexion, wearing blue jeans and brown sweater.
New Orleans Police Department Sergeant Ronald Smith testified that on October 31, 1989, he investigated the rape of G.N. at 2333 Lafreniere Street. He said the victim was very emotionally traumatized, her face was swollen, she was especially puffy around her eyes, had a split on her bottom lip, and an injury to a finger on her right hand, which the victim said was a bite mark sustained when her assailant bit her as she attempted to fight him off. Sgt. Smith detailed his investigation of the scene and that he then took G.N. to Charity Hospital. Sgt. Smith testified that the victim was unable to provide police with a good enough description of her assailant's facial features to assist them with a composite sketch, because she said her assailant had a pair of underwear on his head during the attack.
On cross-examination, Sgt. Smith stated that if his initial report did not reflect that *1012 G.N.'s assailant had facial hair, then she had not described any. The report also reflects nothing regarding the assailant's eye color, nose, teeth, or speech, and nothing about any birthmarks, facial oddities, scars or tattoos. There was nothing in the report indicating that the assailant was wearing gloves, and Sgt. Smith did not recall whether police dusted the crime scene for fingerprints.
Patricia Daniels, a medical technologist employed by the Orleans Parish Coroner's Office, testified that she performed tests on items in a rape kit bearing item number J40616-89, G.N.'s rape kit, and bearing her initials and a date, 11-6-89, the date and time she received the kit. She said the vaginal swabs were positive for the presence of seminal fluid and spermatozoa. Ms. Daniels testified that eighty percent of the population are secretorsthey secret their blood type through bodily fluids such as saliva, seminal fluid, and vaginal secretionswhile twenty percent are nonsecretors. She testified that the victim was a type B secretor, and that all she found in the vaginal swab testing was type B secretor indication. She said, for example, that if G.N.'s assailant had been a type A secretor, then she would have expected to pick up AB secretor indications in the swab. She stated that if defendant had B blood type and was a non-secretor, that would be consistent with her findings.
On cross-examination, Ms. Daniels said that G.N.'s assailant could have been a type B secretor, or a non-secretor. She said that in G.N.'s case, she put a second vaginal swab and a sample of the victim's blood into a freezer at the crime lab, which she always does if the tests are positive for seminal fluid or spermatozoa. She said she did not know whether that evidence was going to be used for DNA testing. She said she wore non-sterile plastic gloves during the testing process, but no facemask, and said she normally does not touch anything else while performing the tests.
New Orleans Police Officer Harry O'Neil, a criminalist with the crime lab from 1981 to 1992, identified the rape kit in G.N.'s case, by his initials on it, and stated that he would have picked it up from the property room, brought it to the crime lab, and assigned it to a particular officer or medical technologist for testing. Officer O'Neil said it is crime lab policy not to take unsealed evidence from the property room, and that if the rape kit in G.N.'s case had been unsealed, he probably would not have taken it.
New Orleans Police Officer Edgar Dunn, a criminalist with the crime lab, testified that he tested a saliva sample from defendant, and found no secretor activity, indicating that he could be a nonsecretor. Officer Dunn identified the tube containing the sample of saliva from defendant, bearing the officer's initials, and said the seal he placed on it after testing was unbroken.
Daniel Waggaspat, employed by the Jefferson Parish Sheriffs Department forensic laboratory, testified that he retired from the New Orleans Police Department in 1994, after twenty-five years in the criminalistics field. Deputy Waggaspat testified that he picked up a sample of defendant's blood at the New Orleans Police Department's property room, tested it, and found it to be type B.
New Orleans Police Officer James Gahagan testified that he was assigned to the crime lab on the night of October 31, 1989. He was dispatched to the scene of G.N.'s rape, where he photographed the victim and collected an unknown fluid from the bathroom floor. He submitted that sample to the police evidence and property room. He also dusted a windowsill for fingerprints, but found none.

Testimony regarding the Defendant
New Orleans Police Detective Ned Gonzales, assigned to the rape section since 1988, testified that on February 18, 1991, he was patrolling the Gentilly area looking for a rapist who had committed more than *1013 one rape in the neighborhood, the last one being the rape of F.F. on January 6, 1991. He was looking for a black male, in his early to mid thirties, approximately six feet tall, one hundred and seventy-five pounds, with a medium to long jeri curl hairstyle. At approximately 1:00 a.m., he observed defendant in a driveway of a residence two doors down from F.F.'s residence. He said defendant was standing next to a fence, and that when he made eye contact with him, defendant began to walk away. He said defendant was six feet one inches tall, weighed one hundred and eighty pounds, and had jeri-curled hair in a ponytail. He also said defendant was then thirty-six years old. He ordered defendant to stop and turn around. Defendant stopped and his arms went to his waistband. He ordered defendant to turn around again and to put his hands up in the air. Finally, on the third command, defendant turned around with his hands up in the air and said, "I don't have anything, Officer." He subsequently searched defendant and recovered a pair of gloves from defendant's left front pocket and a knife from his right front pocket. Det. Gonzales testified that the location of the rape of G.N. was just across the interstate from the location where defendant was arrested.
On cross-examination, Det. Gonzales stated that he did not know whom the residence belonged to where defendant was standing when he first saw him. He said defendant did not appear that he was trying to escape, but that he was walking away at a fast pace. He said he detained defendant for carrying a concealed weapon.
New Orleans Police Detective Ronald Puigh, a rape section detective from 1986 through 1991, testified that in February 1991, he and his partner transported defendant to the criminal court building for the purpose of drawing blood from him. Det. Puigh's partner maintained control of the blood until he turned it over to the central property room. Det. Puigh said he later executed a search warrant at defendant's residence, where he recovered five gloves. In late March 1991, Det. Puigh was contacted by G.N., who had seen a noon news broadcast on the subject who had raped her. At approximately 7:45 p.m. that same day, Det. Puigh conducted a photographic lineup, wherein G.N. identified defendant as the man who had raped her. Det. Puigh subsequently attempted to conduct a physical lineup, but was unable on that particular day to round up enough prisoners with physical characteristics similar to defendant's.
The defense presented as a witness, New Orleans Police Officer Cindy Burkhart, who had been a rape section detective in 1991. She testified that she participated in the investigation of a rape involving a victim named K.K. in 1991. She showed a photographic lineup to K.K. in March 1991, and the victim identified defendant Darnell Lewis as the man who raped her. Officer Burkhart viewed the photographic lineups shown by police to the victims in the instant case, G.N. and F.F., and said that all six photos in each lineup were the same as those in the lineup shown to K.K. Officer Burkhart said she was unsure of the disposition of the charges against defendant in connection with that rape.
The parties stipulated that the State's DNA tests performed on sperm recovered from the vagina of K.K. excluded defendant Darnell Lewis as the sperm donor. It was further stipulated that DNA testing on the sperm recovered from G.N. did not exclude defendant as the sperm donor in her case.
Sandra Lewis, defendant's brother, testified that defendant did not have an automobile in February 1991, and would either use public transportation or walk. She said he especially liked to walk. She lived on Painter Street in Gentilly, and said that defendant would walk from his house to her house. Ms. Lewis also testified that, at the time defendant was arrested, he had a mole on his face, that he had had the *1014 mole his whole life, and that it was always the same size as it was at trial.
Dr. Robert Elston, by stipulation, an expert witness in the field of biometric genetics and statistical genetics, testified that seventy-one percent of black American males could have deposited the sperm in victim G.N.
Dr. Robert Atkin, a professor and director of the Immunogenetics DNA Diagnostics Laboratory at the University of Alabama Health Services, was qualified as an expert witness in the field of DNA testing and analysis, and molecular genetics. Dr. Atkins reviewed the results of DNA testing performed by the State on the semen or sperm found in G.N. and on defendant's blood. He stated that two of the three interpretations of the results would exclude defendant as the source of the semen and sperm found in G.N. The third interpretation would be inconclusivethat is, a part of the results matched defendant, a part did not; but that result could not exclude the possibility that defendant was the source of the semen and sperm. Dr. Atkins said DNA testing is set up to exclude, not identify, and that DNA testing could not conclusively identify someone.

ERRORS PATENT[5]
A review of the record reveals one error patent. The trial court sentenced defendant on the one count of aggravated crime against nature, a violation of La. R.S. 14:89.1, to serve ten years in the custody of the Department of Corrections. La. R.S. 14:89.1(B) provides that any sentence be served without benefit of probation, parole or suspension of sentence. However, because the error is favorable to the defendant, and is not raised by the State on appeal, the error may not be corrected by this court. State v. Hebert, 95-1563, p. 3 (La.App. 4 Cir. 1/31/96), 669 So.2d 499, 502, writ denied, 96-0568 (La.6/28/96), 675 So.2d 1117.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant argues that the trial court erred in denying defendant's motion to sever.
La.C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
La.C.Cr.P. art. 495.1 provides for severance of joined offenses, and states:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
In State v. Johnson, 96-0950 (La.App. 4 Cir. 8/20/97), 706 So.2d 468, writ denied, 98-0617 (La.7/2/98), 724 So.2d 203, cert. denied, Johnson v. Louisiana, ___ U.S. ___, 119 S.Ct. 1054, 143 L.Ed.2d 60, 67 USLW 3526 (1999), this court stated:
Generally, the trial court is vested with much discretion in its determination of whether to grant a motion to sever, and such determination should be upheld in the absence of an abuse of this discretion. State v. Brooks, 541 So.2d 801 (La.1989). Usually, "there is no prejudice and severance is not required if the facts of each offense are not complex, and there is little likelihood the jury will be confused by the evidence of more than one crime." State v. Lewis, 557 *1015 So.2d 980, 984 (La.App. 4 Cir.1990), writ denied, 578 So.2d 922 (1991).
96-0950 at 14, 706 So.2d at 476.
A defendant has a heavy burden of proof when alleging prejudicial joinder of offenses; and must make a clear showing of prejudice. State v. Guccione, 96-1049, p. 12 (La.App. 5 Cir. 4/29/97), 694 So.2d 1060, 1066, writ denied, 97-2151 (La.3/13/98), 712 So.2d 869. In determining whether joinder of two or more offenses would result in prejudice, a court should consider: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Amato, 96-0606, p. 9 (La.App. 1 Cir. 6/30/97), 698 So.2d 972, 982, writs denied, 97-2626, 97-2644 (La.2/20/98) 709 So.2d 772; Guccione, 96-1049 at pp. 11-12, 694 So.2d at 1066.
The jury was faced with a defendant charged with committing the aggravated burglary of the residence of each of the two victims, the aggravated rape of each victim, and the aggravated crime against nature as to one victim, a total of five offenses. Generally speaking, the amount of evidence was double what it would have been had defendant been separately tried for the offenses against each victim. However, that will almost inevitably be the case when offenses against separate victims are tried jointly. The evidence in this case, with the exception of the DNA testimony, which pertained only to G.N.'s case, was not difficult to comprehend. Nothing suggests that the jury was unable to segregate the five charges and evidence relating to each.
There is no evidence suggesting that defendant was "confounded" in presenting a defense, that is, that he wished to testify on some counts but not on others, and was effectively prevented by the joinder from testifying at all. See State v. Feeback, 414 So.2d 1229, 1233 (La.1982).
Considering that defendant presented evidence that he had been identified by yet a third rape victim, but that DNA tests positively excluded him as a suspect in that case, it is doubtful that the jury used the alleged offenses against the two victims to infer criminal disposition on defendant's part. The jury could just as well have believed that defendant was wrongfully accused in the instant two cases as he had been in the other case. Also, it cannot conclusively be said that trying charges relating to two victims made the jury any more hostile to defendant than they might have been had he been tried for the offenses against only one victim.
Finally, a further consideration is whether it appears that evidence of one crime would have been admissible at trial of the other crime under State v. Prieur, 277 So.2d 126 (La.1973) and La. C.E. art. 404(B)(1), which provides that evidence of other crimes, wrongs, or acts is admissible in order to show intent, preparation, plan and knowledge. See State v. Johnson, 96-0950 at pp. 15-16, 706 So.2d at 476-477; see also State v. Stevens, 522 So.2d 1218 (La.App. 4 Cir.1988), writ denied, 524 So.2d 517 (La.1988). If the prosecution is using evidence of other crimes to show the defendant's intent, then the state must only show that the crimes are similar. State v. Winn, 97-2509, p. 4 (La.App. 4 Cir. 1/14/98), 705 So.2d 1271, 1273, citing this court's decision in State v. Langley, 95-2029 (La.App. 4 Cir. 9/4/96), 680 So.2d 717, writ denied, 96-2357 (La.2/7/97), 688 So.2d 498.
In the instant case, evidence of the offenses committed against one victim would have been admissible at trial of the crimes committed against the other victim. The crimes were similar in a number of respects: (1) the attacker broke into the homes of both victims; (2) both victims *1016 resided in the Gentilly neighborhood; (3) both attacks occurred at night; (4) both victims were bound; (5) the hands of both victims were bound in the same manner behind their backs; (6) both victims were bound with lingerie, one with a pair of stocking, the other with her own slip and bra; (7) both victims were penetrated both anally and vaginally; and (8) both victims were forced to turn around, or over, and were then sexually assaulted from behind.
Considering all of these factors, it cannot be said that the trial court abused its discretion in denying defendant's motion to sever.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In this assignment of error, defendant argues that the trial court erred in refusing to replace the voir dire panel after the prosecutor referred to inadmissible other crimes evidence, and, defendant also argues, to his failure to testify.
Before one of the prosecutors began asking questions of a voir dire panel, she asked the jurors if they had any questions. One juror asked:
If someone who's charged of [sic] committing a crime within the course of the trial will it be mentioned if that person had committed that crime prior to this conviction or would that be something that you cannot know?
To which the prosecutor replied:
The State will present to you its case and during the course of its case the State is not allowed to present to you any evidence of any other crimes. The only time that a State can bring out evidence of other crimes is if a witness takes the stand and we can bring out evidence of other crimes for what we call  it's called impeachment of a witness.
Defense counsel apparently objected, as indicated by the notation of a sidebar discussion immediately following the prosecutor's explanation. However, the transcript of that sidebar discussion is not in the record. Following the sidebar discussion, the trial court instructed the jurors about the presumption of innocence and about the burden of proof being on the State. The court informed jurors that the defendant did not have to present any evidence or testify, and asked if any of them would hold it against him if they did not hear him testify that he did not commit the crimes.
Defendant claims that the prosecutor's answer to the juror's question constituted an impermissible reference to another crime committed or alleged to have been committed by the defendant as to which evidence was not admissible. Defense counsel submits in his brief on appeal that "the state clearly attempted to instruct the jury that if Mr. Lewis did not testify, he may not be doing so because he wanted them to remain ignorant about other crimes he committed."
La.C.Cr.P. art. 770 provides that a mistrial shall be granted on motion of a defendant when remarks or comments made within the hearing of the jury by a prosecutor refer directly or indirectly to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible, or which refers directly or indirectly to the failure of the defendant to testify in his own behalf. Defendant cites no provision of law providing that if such a remark is made during voir dire, instead of a mistrial, he is entitled to a new jury venire.
Regardless, the prosecutor's answer to the juror's question clearly did not infer that defendant had committed any other crimes. The answer was not in any way a direct or an indirect reference to another crime committed by defendant. Nor was it a direct comment on the defendant's failure to testify. The answer simply explained to the jury under what circumstance a hypothetical defendant's other crimes could be brought up.
Even assuming that it was an indirect reference to the failure to testify, an indirect *1017 reference would mandate a mistrial or other remedial action only if the trial court determines that the comment was intended to draw the jury's attention to the failure to testify. State v. Hamilton, 92-1919, p. 12 (La.9/5/96), 681 So.2d 1217, 1225, cert. denied, Hamilton v. Louisiana, 520 U.S. 1216, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997). Nothing suggests that the prosecutor's answer to the juror was intended to draw attention to any failure on the part of defendant to testify. Accordingly, the trial court's failure to excuse the entire jury venire because of this statement by the prosecutor was not error.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3
In this assignment of error, defendant claims the trial court erred in admitting irrelevant and highly prejudicial evidence, namely, gloves seized from defendant's home, and gloves and a knife seized from defendant's person when he was arrested.
"`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 401. Relevant evidence is generally admissible. Irrelevant evidence is not admissible. La. C.E. art. 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time." La. C.E. art. 403.
Relevant evidence in a criminal case is that which tends to show commission of the offense charged, and intent, or tending to negate commission and intent. State v. Miles, 402 So.2d 644, 647 (La. 1981). A trial court's ruling as to relevancy should not be disturbed absent a clear abuse of discretion. State v. Whittaker, 463 So.2d 1270, 1272 (La.1985); State v. Badon, 95-0452, p. 8 (La.App. 4 Cir. 11/16/95), 664 So.2d 1291, 1296.
As to the gloves, there was no direct evidence that defendant was wearing gloves at the time he entered the victims homes and/or committed the offenses. However, Officer James Gahagan, with the crime lab, testified that he dusted a windowsill at G.N.'s residence for fingerprints, and found none. Officer Gahagen also testified that he processed F.F.'s residence, where he checked for fingerprints, but found none. The absence of fingerprints could possibly be explained by the fact that the perpetrator wore gloves at certain times during the commission of the offenses, such as when breaking into the residences of the victims.
As to the knife defendant was carrying in his pocket at the time of his arrest, Detective Ned Gonzales testified that defendant was detained for carrying a concealed weapon, the knife. Further, F.F. testified that her attacker cut off her clothes with a knife, and held it against her neck as he sexually assaulted her. G.N. had just gotten out of the bathtub, and was only wearing a towel when she was attacked. No knife was used in the attack on her.
Thus, the fact that defendant had gloves at his home, and on his person (in his left front pocket, not on his hands) when arrested at 12:45 a.m., one house away from one victim's residence, and in the same vicinity of the other victim's home, bears on defendant's plan and preparation. The gloves were relevant evidence in that they could have been used to prevent fingerprints from being left at the scene of the crimes. Further, Det. Gonzales, who arrested defendant, testified that defendant did not immediately turn around when commanded to do so, but that his arms went to his waistband area. Thus, defendant may have been wearing gloves at the time he was ordered to stop, but may have removed them before turning around to face Det. Gonzales. This is evidence of guilty knowledgehe wore the gloves *1018 while breaking into the homes of his victims, and hurriedly removed them when stopped by police.
Similarly, the knife is also relevant as to plan and preparation.
Defendant also claims the trial court erred in allowing in evidence pertaining to the circumstances of his arrest. During the testimony of Det. Ned Gonzales, defense counsel first objected in anticipation of the witness stating that he recovered a pair of gloves and the knife. It has already been determined that the gloves and knife were relevant and admissible, therefore, the circumstances of their seizure were also admissible. Defense counsel's next anticipatory objection, as to Det. Gonzales' immediately forthcoming testimony concerning his experience as a burglary detective, relative to the gloves, was sustained by the trial court. Defense counsel next objected to the introduction of some photographs of the scene of the arrest. Defendant does not address this photograph on appeal. The next objection, as to defendant's whereabouts at the point Det. Gonzales first saw him, was sustained. The next objection, as to why defendant was arrested, was sustained. Defense counsel's final objection apparently was as to what counsel felt was a mischaracterization of a question she had previously asked Det. Gonzales, regarding why he stopped defendant. That objection was overruled, but it is not cited by defendant as error.
A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A); State v. Williams, 96-1023 p. 8 (La.5/28/98), 708 So.2d 703; State v. Henry, 96-1280, p. 6 (La.App. 4 Cir. 3//11/98), 709 So.2d 322, 325. Other than the fact that the gloves and a knife were recovered from defendant at the time of his arrest, which evidence is relevant and admissible, defendant has not preserved any error for review regarding testimony about the circumstances of defendant's arrest.
Defendant cites a number of cases in support of its argument that it is error to admit a weapon into evidence when the weapon was not the one used in the commission of the offense. In State v. Manieri, 378 So.2d 931 (La.1979), the State introduced three knives, one of which was found in a kitchen drawer of the victim's residencethe victim had been strangled and repeatedly stabbed in his own residence. The decision does not reflect where the other two knives came from. None of the knives had bloodstains on them, and a State witness admitted that none of them was the murder weapon. On appeal, the court stated that it is error to admit such weapons because the prejudicial effect outweighs any probative value. The court went on to find, however, that, because the jury heard a State witness testify that none of the knives was the murder weapon, and no effort whatsoever had been made to connect the knives with the defendants or the crime, the error was harmless. 378 So.2d at 933.
In State v. Landry, 388 So.2d 699 (La. 1980), cert. denied, Landry v. Louisiana, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981), the trial court admitted a pocketknife found on the defendant when he was arrested for a stabbing death. The Supreme Court found that it was error to admit the knife into evidence. However, because the State made no attempt to connect the knife with the killing or exploit the admission of the knife in argument, the court held that the error was not reversible. 388 So.2d at 704.
In State v. Villavicencio, 528 So.2d 215 (La.App. 4 Cir.1988), writ denied, 533 So.2d 14 (La.1988), the trial court admitted a .22 caliber rifle and bullets, some .357 caliber bullets, and photographs of the defendant's car with these items inside. The defendant was charged with shooting the victim with a handgun. This court found it was error to admit the evidence because it was prejudicial, citing Manieri but not specifically finding that the prejudicial effect outweighed any probative value of the *1019 evidence. This court went on to find no reversible error because the State had not attempted to link the rifle and the .22 caliber bullets with the shooting. 528 So.2d at 217. Nothing was said regarding any argument by the State concerning such evidence.
In State v. Richardson, 96-2598 (La. App. 4 Cir. 12/17/97), 703 So.2d 1371, writ denied, 98-0228 (La.9/25/98), 726 So.2d 7, the trial court allowed the introduction of a shotgun found abandoned by defendant in an incident unrelated to the armed robbery, committed with a handgun, for which he was being tried. This court found no reversible error, in part, because the victim and a police officer testified that the shotgun had not been used in the robbery. 96-2598 at p. 6, 703 So.2d at 1374.
In the instant case, the prosecutor clearly referred to the knife and the gloves during his closing argument. However, the prosecutor did not in any way attempt to link this particular knife or these particular gloves to the particular crimes alleged to have been committed by defendant. There was the danger that a juror might come to that conclusion, the danger recognized in Manieri and the other cases discussed. However, unlike those cases, the knife and gloves in this case were relevant to show preparation and plan in two similar crimes alleged to have been committed by the same defendant.[6]
It cannot be said that the trial court abused its discretion in implicitly determining that, considering the facts and circumstances of the crimes and defendant's arrest, the items were relevant, and the probative value of these items was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury or by considerations of undue delay or waste of time.
However, even assuming that the physical evidence and testimony relating thereto was improperly admitted, such error is subject to the harmless error analysis. State v. Richardson, 96-2598 at p. 5, 703 So.2d at 1373. An error is harmless if the reviewing court finds beyond a reasonable doubt that the verdict was "surely unattributable to the error." State v. Vale, 96-2953, p. 2 (La.9/19/97), 699 So.2d 876, 877; State v. Richardson, 96-2598 at p. 5, 703 So.2d at 1373.
The jury heard each victim positively identify defendant as the individual who raped her. The physical evidence could not exclude defendant as G.N.'s attacker. Defendant was arrested at 12:45 a.m. coming out of a driveway one house away from the location of the residence of F.F., who had been raped one and one-half months earlier. The circumstances of defendant's arrest, at night, lurking in driveway of a residence, were similar to the circumstances surrounding the attack of G.N., who lived across Interstate 10 from the site of his arrestand F.F.'s residence. G.N. had seen her attacker lurking in a driveway of a neighbor's residence one house away from hers, and was attacked by the man after she went inside. Also, the State made no effort to connect any of the gloves or the knife to either of the two crimes for which defendant was being tried.
Considering the evidence as a whole, it appears that the jury verdict was surely unattributable to any error by the trial court in allowing the gloves and knife to be introduced in evidence, or in allowing testimony concerning this evidence.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant argues that the trial court erred in admitting the vaginal swabs contained in *1020 the rape kit of G.N., because an inadequate foundation had been laid.[7]
The admissibility of the vaginal swabs is governed by La. C.E. art. 901(A), which provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility... is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims it is." State v. President, 97-1593, p. 18 (La.App. 3 Cir. 7/15/98), 715 So.2d 745, 754, writ denied, 98-2115 (La.12/11/98), 729 So.2d 590, 1998 WL 956278. "The issue of authenticity must be determined at two stages of a proceeding. First, the court must determine if the proffered item appears sufficiently genuine so that its admission could assist the fact-finder. Second, the factfinder must ultimately determine whether he believes that the evidence is actually genuine." 1998 Author's Notes to La. C.E. art. 901, Note (2).
The State and defendant differ on the required standard for admissibility of the vaginal swabs, centering on the chain of custody issue. The State submits that the following rule applies, as set forth by this court in State v. Merrill, 94-0716, p. 9 (La.App. 4 Cir. 1/31/95), 650 So.2d 793, 799, writ denied, 95-0530 (La.6/23/95), 656 So.2d 1012:
[A] lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than its admissibility. State v. Sam, 412 So.2d 1082, 1086 (La.1982); State v. Alexander, 621 So.2d 861, 864 (La.App. 5th Cir.), writ granted and case remanded for resentencing, 629 So.2d 376 (La. 1993).
In order to introduce demonstrative evidence at trial, the law requires that the object be identified. This identification may be visual (i.e., by testimony at the trial that the object exhibited is the one related to the case) or it may be by chain of custody (i.e., by establishing the custody of the object from the time it was seized to the time it was offered in evidence.) State v. Sweeney, 443 So.2d 522, 528 (La.1983).
The law does not require that the evidence as to custody eliminate all possibility that the object has been altered. For admission, it suffices that it is more probable than not that the object is the one connected to the case. State v. Frey, 568 So.2d 576, 578 (La.App. 4th Cir.1990), writ denied, 573 So.2d 1118 (La.1991).
94-0716 at p. 9, 650 So.2d at 799.
Merrill dealt with the chain of custody of crack cocaine seized from defendant. Only one witness testified about the chain of custody, the officer who purchased the cocaine from the defendant. There was a gap in the chain of custody from the time the cocaine was seized until the time it was offered into evidence. At some point, the cocaine was mailed to the Louisiana State Police Crime Laboratory. At trial, an envelope containing the cocaine was sealed with tape from that agency. On the envelope were the arresting agency's item number, and the date it was received in the State Police lab, 8/6/92. Inside was a second envelope with the purchasing officer's initials and the item number. Inside of that second envelope was the cocaine, marked with the item number and the date purchased, 7/9/92. There was no evidence as to what the officer had done with the cocaine after purchasing it, or as to when it had been forwarded to the State Police lab. Despite these problems, this court found that it was "more probable than not" that the cocaine was connected to the officer's purchase from the defendant.
All of the other circuits follow the rule espoused in Merrill to chain of custody issues in cocaine cases. See State v. Spradley, 97 2801, p. 5 (La.App. 1 Cir. 11/6/98), 722 So.2d 63, 69; State v. Boykin, 29,141, p. 5 (La.App. 2 Cir. 1/31/97), 688 *1021 So.2d 1250, 1253-1254; State v. Green, 96-208, pp. 13-15 (La.App. 3 Cir. 11/6/96), 683 So.2d 1292, 1299-1301, writ denied, 96-2892 (La.6/13/97), 695 So.2d 963; State v. Sias, 97-283, pp. 2-3 (La.App. 5 Cir. 1/27/98), 706 So.2d 650, 652, writ denied, 98-0505 (La.6/26/98), 719 So.2d 1056.
In Note (3) to the 1998 Author's Notes to La. C.E. art. 901, it notes the rule set forth in Merrill, but states: "In contrast to the less exacting chain of custody requirements sometimes reflected in criminal cases, the courts at times appear to be very demanding in civil cases relative to the admissibility of blood alcohol tests." In arguing that a more stringent standard is applicable to chain of custody issues involving blood and vaginal swabs, defendant cites numerous civil cases.
Defendant cites Wells v. State Farm Mut. Auto. Ins. Co., 573 So.2d 223 (La. App. 1 Cir.1990), where the court held that blood test results were not admissible because the nurse who actually drew the blood did not testify at trial to show that the blood was properly taken, and no one could testify as to the whereabouts or security of the vials of blood for two separate three-day periods. Id. at 227
In Holmes v. Christopher, 435 So.2d 1022 (La.App. 4 Cir.1983), writs denied, 440 So.2d 723, 724, 765 (La.1983), this court held that a blood sample was not admissible for a number of reasons, including that it had not been shown that the blood had been properly drawn for alcohol content testing, which required that no alcohol swabs be used to prepare for needle insertion because of possible contamination of the sample with alcohol. Also, there had been no showing that the tube into which the blood had been drawn had not been contaminated with alcohol. Finally, the tube of blood had not been sealed, but merely had a removable rubber stopper placed in it.
In Swanson v. Augusta's Estate, 403 So.2d 118 (La.App. 4 Cir.1981), writ denied, Swanson v. Estate of Augusta, 407 So.2d 732 (La.1981), this court affirmed a decision of the trial court refusing to allow a urine test offered to show alcoholic content, because no witnesses had been called to testify that the receptacles in which urine specimens had been placed had not been washed with ethyl alcohol. Id. at 124
In Lawless v. New Orleans Police Dept., 550 So.2d 252, 254 (La.App. 4 Cir.1989), writ denied, 551 So.2d 1344 (La.1989), this court held:
[B]efore test results, including blood alcohol test results, can be admitted in a civil or a criminal proceeding, the party seeking to introduce the results must lay a proper foundation by "connecting the specimen with its source, showing that it was properly labeled and preserved, properly transported for analysis, and properly taken by an authorized person, properly tested."
In Lawless, a pathologist testified that he drew blood from the decedent. He testified that precautions were taken regarding the chain of custody of the blood after being drawn until after delivery to the toxicologist. The pathologist did not deliver the blood directly to the toxicologist. The toxicologist testified that, although the test had been conducted five years prior to trial, "she had no reason to assume that delivery of the blood sample was by any means other than the routine, which was physical delivery to her or delivery into a locked refrigerator in her laboratory." 550 So.2d at 255.
Lawless does not establish a more stringent rule than the general rule followed by this court in cocaine cases. Nor do the facts in Lawless show a stricter chain of custody than was followed in the instant case.
Dr. Enseleit testified that he performed the rape examination on G.N. at Charity Hospital. He identified the sexual assault examination form that he filled out and signed. Dr. Enseleit noted that the identification number on G.N.'s rape kit, containing the vaginal swabs as issue, was the same as that on his examination form. He *1022 said his job during the examinations is to collect the specimens, and that the assisting nurse labels them, and puts them in the rape kit box. He said the items are placed in the box, the box is sealed, and then it is maintained for a chain of custody with the nurse until it is turned over to police. He said as far as he knew, if the police were not there, the kit would be placed in locked area or a safe until they came to pick it up.
Sgt. Smith identified the rape kit, by his handwriting on it, and said it was the one he gave to be used by the examining physician in conducting the examination. He said he returned to Charity Hospital the next day, retrieved the sealed kit from a locked refrigerator in the examination room, and placed it into evidence at the police department evidence and property room.
Patricia Daniels, the medical technologist with the Orleans Parish coroner's Office, testified that when she received G.N.'s rape kit, it was sealed with evidence tape, and that seal was intact. She identified the rape kit at trial by her initials on it.
Det. Harry O'Neil identified G.N.'s rape kit by his handwriting on it. He said this showed that he had picked up the kit from the evidence and property room, brought it to the crime lab, and assigned it Det. Edgar Dunn. He also said it is not the policy of the crime lab to take unsealed evidence from the property room, and that he probably would not have taken it had it been unsealed.
Det. Edgar Dunn identified G.N.'s rape kit by his initials on it. Det. Dunn confirmed that Det. O'Neil never brings unsealed evidence from the property room. He said "Before we take any evidence out of there we inspect all the evidence to make sure its sealed especially the rape kits, narcotics, blood alcohols, anything where there's a question of evidence being tampered with." He confirmed Ms. Daniels testimony that she broke the seal on the kit. He said that she brought it to him when she was finished. He stated that when he was finished performing his tests, he sealed the kit, and it was returned to the evidence and property room. He identified the seal on the kit at the time of trial as the one he had placed on it after the crime lab testing was completed.
The prevailing jurisprudence applies the more probably than not standard to the chain of custody in cases involving cocaine, which substances are subject to chemical testing. Defendant has not shown that the need for a strict chain of custody in illegal drug cases is or should be greater than the need for preserving vaginal swab evidence for the chemical secretor testing done in the instant case. As far as the preservation of this evidence for DNA testing, it was defendant who introduced testimony and evidence pertaining to the DNA testing performed on the vaginal swabs and blood sample taken from defendant. The defense also stipulated that the DNA tests did not exclude the possibility that defendant was the source of the sperm found on the vaginal swabs. The defense cannot, and does not, attack the chain of custody insofar as it pertains to the DNA testing.
A trial court has great discretion in determining whether a sufficient foundation has been laid for the introduction of evidence. State v. Livings, 548 So.2d 77 80 (La.App. 3 Cir.1989), writ denied, 552 So.2d 394 (La.1989), citing State v. Cobb, 419 So.2d 1237 (La.1982). Considering the evidence discussed above, it would have been within the discretion of the trial court to find that, more probably than not, the vaginal swabs contained in the rape kit introduced at trial were the ones used by Dr. Eneseleit to conduct the sexual assault examination of G.N. on the morning she was raped.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5
In this assignment of error, defendant argues that the evidence was not sufficient to support his convictions.
*1023 This court set out the standard for reviewing convictions for sufficiency of the evidence in State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-28, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La. 1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
97-0318 at pp. 5-6, 703 So.2d at 227-28.
By this claim, defendant does not dispute that, viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that F.F. was the victim of an aggravated rape, an aggravated burglary, and an aggravated crime against nature, and that G.N. was the victim of an aggravated rape and an aggravated burglary. Rather, defendant submits that the evidence is insufficient to establish that he committed those offenses.
The testimony of the victim alone is sufficient to establish the elements of the offense of aggravated rape, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Ingram, 29,172, p. 10 (La.App. 2 Cir. 1/24/97), 688 So.2d 657, 664, writ denied, 97-0566 (La.9/5/97), 700 So.2d 505. Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the jury's trial function. State v. Brumfield, 93-2404, pp. 5-6 (La.App. 4 Cir. 6/15/94), 639 So.2d 312, 316. The determination of the weight of the evidence is a question of fact which rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Silman, 95-0154, p. 12 (La.11/27/95), 663 So.2d 27, 35.
Each victim identified the defendant as the person who attacked her. The general physical description of the person who attacked each victim closely matched the *1024 defendant's general physical description, except for a mole on defendant's face. Each victim admittedly had only seconds to view her attacker. Secretor testing showed that defendant, a non-secretor, belonged to a group of persons ranging from twenty to seventy percent of the population who could have contributed the sperm and seminal fluid found in the vaginal canal of G.N. While two of three DNA test interpretations excluded defendant as a suspect in G.N.'s rape, the defense stipulated that the DNA tests could not exclude defendant as the donor of the sperm found in G.N. No fingerprints, blood or other physical evidence linked defendant to the crimes. Defendant was arrested at 12:45 a.m. coming out of a driveway one house away from the home of one victim, some one and one-half months after she had been raped. This location was across Interstate 10 from the home of the other victim. Defendant had gloves on his person and a knife.
Considering all of the record evidence in this case, in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant was the man who broke into F.F.'s home and raped her and performed oral copulation on her, and that he was also the man who broke into G.N.'s home and raped her.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 6
In this assignment of error, defendant claims that the trial court erred in denying his motion for a new trial.
La.C.Cr.P. art. 851 provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
* * *
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
La.C.Cr.P. art. 858 provides:
Neither the appellate nor supervisory jurisdiction of the supreme court may be invoked to review the granting or refusal to grant a new trial, except for error of law.
La.C.Cr.P. art. 858 applies to review of denials of motions for new trials by appellate courts. State v. Henderson, 444 So.2d 751, 753 (La.App. 4 Cir.1984). A trial court's ruling as to as to the ground for new trial set forth in La.C.Cr.P. art. 851(5), pertaining to the ends of justice, is not reviewable on appeal. State v. Olidge, 575 So.2d 400, 402 (La.App. 4 Cir.1991), writ denied, 629 So.2d 410 (La.1993).
As to ground (2), our review of the evidence in this decision shows no prejudicial error by the trial court in its rulings on written motions or objections made during the proceedings.
In reviewing the law and evidence for consideration of a defendant's motion for new trial as to ground (1), a trial court must make an independent assessment of the evidence as a thirteenth juror. State v. Guy, 95-0899, p. 8 (La. App. 4 Cir. 1/31/96), 669 So.2d 517, 523, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102. The denial of a motion for new trial can be reversed only if it is found to be an arbitrary and palpable abuse of the trial court's discretion. State v. Perron, 94-0761, p. 5 (La.App. 4 Cir. 12/27/96), 686 So.2d 994, 996, writ denied, 97-0090 *1025 (La.1/24/97), 686 So.2d 869; Guy, 95-0899 at p. 8, 669 So.2d at 523.
Defendant avers that the trial court failed to apply the "thirteenth juror" standard of review and failed to reweigh the evidence as it should have. There is a "presumption of regularity" in judicial proceedings. State v. Evans, 96-1139, p. 6 (La.App. 4 Cir. 6/17/98), 715 So.2d 604, 607. Therefore, in the absence of some evidence that the trial court applied an incorrect standard, it must be presumed that it applied the thirteenth juror standard.
During the hearing on the motion for new trial the court stated that it was "very hesitant to act on it by not having heard everything, dealing with the cold pages and argument of counsel. That's the most persuasive argument." Later during the hearing, the trial court commented on defense counsel's argument as to the chain of custody of the rape kit, stating: "And I'm saying that the jury, those 12 people, the weight that they chose to give the chain of custody." At the conclusion of the arguments, the trial court stated: "I'm not going to overrule what the 12 people had to deal with. I don't know why the previous judge punted, if he did in fact did [sic] punt, but I'm not going to second guess. And you're right, it's a different standard once it gets to the 4th [Circuit Court of Appeal]."
The transcript indicates that the trial court did not apply the correct standard for ruling on a motion for new trial on the ground that the law was contrary to the law and evidence. This is an error of law. However, while defendant argues that the comments by the trial court make it clear that the court did not apply the correct standard in ruling on the motion for new trial, defendant failed to object either during the hearing or following the trial court's denial of the motion. Because defendant failed to contemporaneously object to the trial court's application of the incorrect standard, he is procedurally barred from raising this error on appeal. State v. Gaines, 633 So.2d 293, 299 (La.App. 1 Cir. 1993), writ denied, 93-3164 (La.3/11/94), 634 So.2d 839; see also State v. King, 96-1303, p. 5 (La.App. 3 Cir. 4/2/97), 692 So.2d 1296, 1299. It also should be noted that, following an initial hearing on the motion for new trial, defense counsel submitted a memorandum asserting that the State had urged the court to apply an incorrect standard. However, defense counsel did not cite a single case in his memorandum concerning the "thirteenth juror" standard.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 7
In this assignment of error, defendant argues that the cumulative effect of all of the previous alleged errors constitutes reversible error. The only possible error unfavorable to defendant was the trial court's admission into evidence of the gloves and knife, and the allowing of testimony pertaining to this evidence. As previously discussed, this error was harmless.
There is no merit to this assignment of error.
Accordingly, the defendant's convictions and sentences are affirmed.
AFFIRMED.
PLOTKIN, J., would grant rehearing with reasons.
Pursuant to La.C.Cr.P. art. 841(B), a contemporaneous objection is unnecessary for a written motion, here a motion for a new trial. I would grant rehearing and remand this case to the trial court to conduct a hearing on the motion for a new trial.
NOTES
[1] Dr. David Ross, board-certified in emergency medicine, estimated that he had conducted approximately three hundred sexual assault examinations
[2] The trial court refused to allow the rape kit in F.F.'s case to be admitted into evidence.
[3] Dr. Enseleit is board-certified in emergency medicine, testified that he had performed between fifty and one hundred sexual assault examinations
[4] No inculpatory evidence was recovered during F.F.'s examination.
[5] Defendant requests a review for errors patent by his Assignment of Error No. 8.
[6] While no knife was used to cut clothes off of G.N., she had just gotten out of the shower and was wrapped only in a towel.
[7] While defendant's argument refers to F.F.'s rape kit, the trial court refused to allow that to be introduced into evidence. Only G.N.'s rape kit was allowed into evidence.