713 So.2d 796 (1998)
STATE of Louisiana
v.
Oscar L. CARTER.
No. 97-KA-1096.
Court of Appeal of Louisiana, Fourth Circuit.
May 20, 1998.
*797 Harry Connick, District Attorney, Orleans Parish, Teresa A. Tamburo, Assistant District Attorney, Orleans Parish, New Orleans, for Plaintiff/Appellee.
Kevin Boshea, Regan & Boshea, New Orleans, for Defendant/Appellant Oscar L. Carter.
Before KLEES, PLOTKIN and McKAY, JJ.
McKAY, Judge.
Oscar L. Carter appeals his conviction and sentence for forcible rape and aggravated oral sexual battery. We reverse and remand this case for further proceedings.
The defendant was charged by a bill of information with forcible rape, a violation La.R.S. 14: 42.1 and aggravated oral sexual battery, a violation of La.R.S. 14: 43.4.
On March 13, 1996 a twelve member jury found him guilty as charged on both counts. A Motion for Judgment Notwithstanding the Verdict and Motion for a New Trial was denied on July 2, 1996.
Carter waived delays and was sentenced on the forcible rape count to ten years at hard labor, the first two years without benefit of probation, parole, or suspension of sentence, the next eight suspended, and five years active probation with special conditions. On the aggravated oral sexual battery, the defendant was sentenced to two years at hard labor without benefits, to run concurrent with the other sentence.
*798 Oscar Carter now appeals, asking this court to review the record for errors patent. He further argues that the evidence was insufficient to support his conviction. He contends that the trial court erred in allowing evidence of other crimes to be to be improperly included into evidence without legal predication.

FACTS OF THE CASE
P.C.[1] and the defendant were "telephone friends" in high school. They went to different high schools, but P.C. went to defendant's high school baseball games. Both P.C. and the defendant testified that there was no romantic involvement between them during those years. After high school, they went their separate ways. The defendant went to college in Baton Rouge. P.C. joined the army. P.C. married a man who was also in the military and traveled with him. In 1981, P.C.'s son died. In 1987, her husband died. In August of 1991, she returned to New Orleans and opened a gift shop on the West Bank. One day a customer mentioned defendant's high school and P.C. asked if she knew the defendant. The customer responded that she did. She related that the defendant lived on the West Bank and that his wife had died. P.C. phoned the defendant and invited him for dinner. The defendant came over with a photograph album of his family. The defendant then refused several subsequent invitations from P.C. However, in May or June of 1993 they began to see each other.
In June of each year P.C. went to Virginia to put flowers on the graves of her husband and her son. In June of 1993, the defendant went with her on this trip. The couple drove back through North Carolina, where the defendant met P.C.'s daughter. An intimate relationship developed between P.C. and the defendant during this trip. In the summer or fall of 1993 they became engaged. At some point during their engagement, the defendant asked for the ring back; however, the engagement was back on at the time of this alleged offense in February of 1994.
On February 8, 1994, P.C. asked the defendant for $5,000.00 due to cash flow problems. The defendant was aware that P.C. owned several pieces of property with mortgages, at least one of which was vacant, and some of the property needed repair. However, P.C. testified that she needed the cash for Valentine's Day inventory for her shop. The defendant testified that she never told him the cash was for the Valentine's Day inventory. He assumed it was to pay the mortgage notes or repairs on her property. In either event, the defendant said he could get her the money. He spoke with her later to say that if she needed $5,000.00, she could probably use $10,000.00, and he could get it for her.
According to P.C., the defendant wanted her to refinance some of the property and put his name on it. She asked instead if she could pawn the engagement ring. The defendant did not want that, but rather wanted to give her the cash when the paperwork was completed by his credit union. In the morning and at noon on February 9, the defendant spoke briefly with P.C. on the phone, and they agreed to discuss the matter at P.C.'s house after work.
P.C. went to Specialty Pizza after work and ate there before she went home. The defendant, meanwhile, was waiting at P.C.'s home. P.C. testified that the defendant was angry when she arrived and demanded to know where she had been and with whom. The defendant testified that P.C. was angry because he did not have the money with him, and told him she needed it right away.
P.C. testified that the defendant, in his anger, ordered her to perform oral sex on him, ordered her to take her clothes off and raped her vaginally on the floor, then permitted her to use the bathroom. He then pulled her off the toilet and tried to enter her anally, which she successfully resisted. He then raped her vaginally again. During the course of the incident, P.C. received bruises on her cheek and neck, and her shoulder was dislocated. P.C. also claimed that she was bruised on her back side, though neither the photographs nor the medical report support the latter claim. After the attack, P.C. put on her clothes and moved her car so that the defendant could leave. She then drove *799 herself to Meadowcrest Hospital, where she was treated for her dislocated shoulder.
P.C. testified that she told a nurse at Meadowcrest that she had been beaten. The nurse reported the incident to the police, but P.C. did not speak with the policeman who appeared. She did not tell anyone at Meadowcrest that she had been raped.
The next day, P.C. called a policeman at the district station, whom she knew from her store and from various civic events. He told her to come right over, which she did. She then told the officer that she had been raped. He turned the matter over to a policewoman in the rape investigations unit. This officer took P.C. to Charity Hospital for a rape examination. She also took an oral statement from the defendant. According to the investigating officer, the defendant admitted having consensual sex with P.C. on the night in question, and further stated that the injury to P.C. occurred as the result of an accident in which he reached for her and they both fell, with the defendant falling on top of P.C.
The medical testimony indicated that there was no evidence of trauma to the vaginal area. There was no examination of the anal area because P.C. never advised the examining physician that the defendant attempted anal penetration. The swabs and smears taken as a part of the examination were negative for sperm or seminal fluid.
The defendant testified that P.C.'s injuries were the result of an accidental fall, and denied having told the investigating officer that he had consensual sex with P.C. that evening. Rather, he testified that he told the officer that they had consensual sex in the past.
The defense also put on two witnesses who testified as to the defendant's reputation for truthfulness. The defense also cross-examined P.C. relative to a civil suit which she filed against the defendant shortly after the subject incident.

ERRORS PATENT REVIEW
A review of the record for errors patent reveals that there was an incorrect number of jurors as to La.R.S. 14:43.4, oral sexual battery, which is a felony punishable with or without hard labor, triable by a jury of six. In the case at bar the defendant was tried on both counts of the bill of information by a jury of twelve. The law did not change until 1997 by La. Acts 599 Sec. 1, when the legislature added La.C.Cr.P. art. 493.2, which permits such joinder of offenses, to be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. However, there was no such provision at the time of the defendant's trial. A verdict returned by a jury composed of either more or less than the correct number of jurors is null. State v. Smith, 367 So.2d 857 (La.1979). Accordingly, the conviction for aggravated oral sexual battery, La.R.S. 14:43.4, is reversed and the sentence vacated. The case is remanded to the district court for a new trial.

ASSIGNMENT OF ERROR I: SUFFICIENCY OF THE EVIDENCE
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. When the entirety of the evidence both admissible and inadmissible is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must review the assignment of error to determine whether the accused is entitled to a new trial. State v. Hearold, 603 So.2d 731 (La.1992).
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987). The reviewing court is to consider the record as a whole, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305, 1309-10 (La.1988). In applying this standard, the reviewing court must defer to the credibility choices and justifiable inferences of fact made by the jury. State v. *800 Rosiere, 488 So.2d 965, 968 (La.1986); State v. Foy, 439 So.2d 433, 436 (La.1983). The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
In the instant case, the victim testified that the defendant forced her to have vaginal intercourse and oral sex, which the defendant denied. Medical evidence confirms that the victim suffered bruises to her face and neck, and she had a dislocated shoulder. The medical evidence did not corroborate the sexual offenses. However, as noted by the examining physicians, a sexually active woman in her fifties who has had children could have forced intercourse without evidence of trauma to the vaginal area due to the elasticity of the vagina. As to the absence of seminal fluid or foreign hairs in the victim's vaginal area, the examining physician noted only that the tests were conducted several hours after the alleged assault, although the victim stated that she had not showered or bathed after the attack and prior to the examination.
Although there were inconsistencies and inadequacies in the victim's account of the events, her testimony was not directly contradicted by the other evidence. After a careful review of the record, this court must accept the version of the facts as given by the victim, and we conclude that the evidence is sufficient to sustain the defendant's conviction.

ASSIGNMENT OF ERROR II: EVIDENCE OF OTHER CRIMES
Admission of evidence of other crimes or misconduct creates the risk that the defendant will be convicted of the present offense simply because he is a bad person. Accordingly, such evidence is not admissible except in limited situations. State v. Reddick, 94-2230 (La.App. 4th Cir. 2/29/96), 670 So.2d 551, writ denied, 96-0799 (La.9/13/96), 679 So.2d 103. However, other crimes evidence is admissible to prove:
... motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceedings.
La. C.E. art. 404 B(1).
The conditions for admissibility of "other crimes evidence" are set forth by State v. Prieur, 277 So.2d 126 (1973). As cited in Prieur, the admissibility of other acts of misconduct involves substantial risk of grave prejudice to a defendant. As to the prejudicial effect of evidence of other crimes, Wigmore says:
... The natural and inevitable tendency of the tribunal-whether judge or jury- is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge ...
1 Wigmore, Evidence section 194 (3rd Ed.).
The probative value of evidence of unrelated offenses in relation to the charged offense should therefore be weighed in light of its possible prejudicial effect and its tendency to influence the triers of fact improperly as to the present guilt of the accused. See McCormick on Evidence, section 190 (Cleary Ed.1972). If evidence of other crimes were freely admissible, a defendant would be forced to defend against charges of which he had no notice and for which he is unprepared. The spirit of our constitutional provisions requires the establishment of safeguards prerequisite to the admissibility of such evidence. Our constitution specifically requires that the defendant be given notice of the offense for which he will stand trial so that he can know the nature and cause of the accusation in order to prepare his defense. Louisiana Constitution Article I, section 10. It permits him full confrontation and cross-examination, which require prior knowledge of the offense and the circumstances so that he may adequately exercise these constitutional rights. Louisiana Constitution Article I section 9. It requires due process and trial *801 for the offense before an impartial jury. Louisiana Constitution Article I, sections 2, 9.
The conditions of admissibility of "other crimes evidence" are clearly set forth in State v. Prieur, id. They include prior notice and a pre-trial determination that the defendant committed these prior acts, that the evidence is neither repetitive nor cumulative, and that the evidence is not being introduced to show that the defendant is of bad character.
In addition, the court must, at the request of the defendant, offer a limiting instruction to the jury at the close of the trial as to the limited purpose for the other crimes evidence. The trial court must also instruct the jury that the defendant cannot be convicted for any crime other than the one charged or any responsive offenses to it. State v. Jackson, 625 So.2d 146, 149 (La. 1993).
In State v. Lee, 618 So.2d 551 (La.App. 4th Cir.), writ denied, 624 So.2d 1222 (La.1993), this court noted that a mistrial is not warranted in spite of a witness's references to "other crimes" evidence, absent showing a pattern of unresponsive answers or improper intent (citing State v. Torres, 580 So.2d 1064 (La.App. 4th Cir.1991); State v. Tatum, 506 So.2d 584 (La.App. 4th Cir.1987)).
In State v. Franklin, 440 So.2d 223 (La. App. 3 Cir.1983), writ denied, 444 So.2d 1241 (La.1984), the Third Circuit found that the cumulative effect on the jury of four testimonial references to other crimes than the crimes charged created such a degree of prejudice against the defendants that they could not be assured of a fair trial, even by admonition to the jury. Specifically, the court stated:
While we are not prepared to conclude that any one of the four instances cited by the defendants, supra; individually warrant a mistrial, we do feel that when these incidents are viewed in light of the cumulative effect on the jury and the trial judge, that they did create such a degree of prejudice against the defendants that they could not be assured of a fair trial, even by admonitions to the jury.
Id. at 228.
The defendant first notes that the "other crimes" evidence of which he complains was referenced by a state witness, not a court official, thus a motion for mistrial under La. C.Cr.P. art. 770 did not apply. The defendant further avers that an admonition under La.C.Cr.P. art. 771 was not requested, as it "would have likely reinforced the impermissible evidence in the minds of the jurors, and further solidified its impact."
In the first instance of inadmissible "other crimes" evidence, the victim P.C., related that she told her policeman friend that she had been beaten and raped. When the prosecutor asked the victim to confirm this statement, she answered: "Yes. And he pulled Oscar's name up from a previous incident where he had beat his wife, yes."
A second reference to the alleged "wife-beating" occurred when the prosecutor asked the defendant's sister if someone from the district attorney's office had asked her questions about the instant offenses. The defendant's sister responded: "No. She said she wanted to know information about had he ever beat his wife." Although neither response appears to have been purposefully elicited by the State, they were both damaging references to inadmissible evidence; especially the reference by the victim, who testified that the officer retrieved the defendant's name from a previous incident. Moreover, the reference by the victim was the first of three references by her which were unresponsive and were likely purposefully uttered. It is logical that P.C. uttered these unresponsive remarks with improper intent of tainting the jury against the defendant.
In another instance of inadmissible "other crimes" evidence, defense counsel was cross-examining the victim relative to her ongoing communications with the defendant's family after the defendant's arrest. Defense counsel was attempting to show that the victim was negotiating with the family for cash in exchange for dropping the charges. The victim responded: "His daughter Karen used to call me while Oscar was in jail. Then after the FBI came to see me and I called them then. The FBI had a picture of Oscar and a picture of somebody who robbed a *802 bank in Metairie and they thought it was the same person, so I called his kids to check on that."
In a third instance, defense counsel asked the victim if she had a conversation with Oscar's sister. The victim responded that the defendant's sister called her to see if she would drop the charges. The victim advised her that she would not because it was the second time the defendant raped her. When the prosecutor pursued this allegation on re-direct examination, defense counsel requested a conference. Following the conference, the victim was permitted to answer questions about her alleged prior rape by the defendant. She responded that the incident occurred on November 30, 1993, which was about three months prior to the subject incident. She explained that she was embarrassed and afraid, and the defendant told her he was sorry. She further explained that there was no beating or injury as a result of the first incident. She further testified that the defendant's daughter invited her to a birthday party in December or January, after which she and the defendant began seeing each other again.
There is no record of the side bar conference which would explain why the court permitted the prosecutor to pursue this line of questioning about a prior offense, for which no notice was provided to the defense, as required by La.C.E.art. 404 B(1). Even assuming that the State failed to give notice of the above-noted "other crimes evidence" because it was unaware of its existence, considering the pattern of unresponsive answers by the complainant/witness, and the nature of the prior offenses alleged, these references very likely affected the verdict, especially considering that the physical evidence provides little corroboration of P.C.'s version of the incident. This was not harmless error.
Accordingly, the convictions and sentences are vacated for the combined reasons stated herein. The case is remanded for a new trial consistent with the holdings contained in this opinion.
REVERSED AND REMANDED.
NOTES
[1] The alleged victim's name will not be referred to in this opinion in order to protect her identity.