EDWIN A. LOMBARD, Judge.
| ,011 appeal the defendant, Tyrone A. Wilson, challenges the sufficiency of the evidence supporting his conviction for armed robbery in violation of La. Rev.Stat. 14:64[1] and aggravated rape in violation of La. Rev.Stat. 14:42[2]. After review of the record in light of the applicable law and arguments of the party, we affirm the defendant’s convictions and sentence.

Relevant Facts and Procedural History

On August 11, 2005, the defendant and his co-defendant, Hampton Franklin,[3] were indicted for armed robbery (count one) and aggravated rape (count two). The defendant pleaded not guilty to both charges but, on December 7, 2007, following a five day trial, the defendant was found guilty as charged on both counts. His motions for a new trial and post-verdict judgment of acquittal were |2denied and on November 3, 2008, he was sentenced on count one (armed robbery) to serve twenty-five years at hard labor with credit for time served and on count two (aggravated rape) to serve life imprisonment at hard labor without benefit of parole, probation or suspen *1033 sion of sentence, and concurrent with his sentence in count one and with any other sentence.

Discussion

The defendant’s sole assignment of error, in briefs filed pro se and by counsel, is that the evidence is insufficient to support his conviction for armed robbery and aggravated rape. Accordingly, under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and La.Code Crim. Proc. art., we “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)). When circumstantial evidence is used to prove the commission of the offense, La. Rev.Stat. 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)). When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. State v. Bright, 1998-0398 (La.4/11/00), 776 So.2d 1134, 1147. The fact-finder weighs the respective credibilities of the witnesses, and a reviewing court will generally not second-guess those | ¡jdeterminations. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). However, the touchstone of Jackson v. Virginia is rationality and that “irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.” State v. Mussall, 523 So.2d 1305, 1310 (La.1988). The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses, State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 880, and we have repeatedly held that a factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 2000-1082 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. The testimony of the victim alone is sufficient to establish the elements of the offense of aggravated rape, even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Lewis, 97-2854 (La. App. 4 Cir. 5/19/99), 736 So.2d 1004, 1023; State v. Carter, 97-1096 (La.App. 4 Cir. 5/20/98), 713 So.2d 796.
The following facts were adduced at trial.
Detective Michael McCleary of the New Orleans Police Department (NOPD) Sex Crime Unit testified that on June 19, 2005, he was notified that a sexual assault had occurred on the Newcomb College Campus of Tulane University. Upon arriving at the university he was informed that there were two crime scenes. The primary crime scene where the assault occurred was an office inside the Woldenberg Art Center. The secondary crime scene was the corner of LBroadway and Plum Streets where the suspects, who were chased off the campus, dropped a bag of items.
Detective McCleary observed that the office was in disarray. The desk telephone *1034 was smudged with bloody fingerprints and had been ripped from the wall. A trash can was searched for condoms; none was found. A jacket was lying on the floor, and a bicycle was leaning against the wall. On a shelf were several liquor bottles. Blood was observed on the floor. Detective McCleary secured the scene with crime tape and notified the crime lab. The crime lab processed the area for blood, semen, fingerprints and other body fluids. Blood and body fluid samples were taken. Several blood smudged fingerprints were lifted from the inside office doors and the desk telephone. In the hallway, Detective McCleary observed a green cloth bag and a plastic toy gun which was retrieved from the corner of Broadway and Plum Streets by Steven Durow, who chased the two suspects from the Woldenberg Center. Durow turned the toy gun over to the Tulane police, who placed it and the bag inside the hallway for processing.
The corner of Broadway and Plum Streets was also secured with crime tape. At the scene a paper bag was observed containing a broken bottle of Courvoisier Liquor and some loose change. The scene was processed by the crime lab.
Detective McCleary drove to the hospital where he retrieved the victim’s clothes and sent out bulletins with the descriptions of the two suspects. He interviewed the victim. She was shaken and had a large laceration to the bridge of her nose. Her eyes were bloodshot, and she seemed confused and dazed. She gave a description of both attackers. Detective McCleary solicited help from the public through Crime Stoppers which resulted in the defendant and Franklin being developed as suspects. Photographic line-ups of the defendant and Franklin were ^prepared and placed in a folder. The victim was contacted, and an appointment was set for her to view the photographs. She was given the folder and told to open it and view the photographs to see if she recognized anyone. Upon viewing the first set of photographs the victim started shaking as she positively identified the photograph of Hampton Franklin. She signed, dated and noted the time on the back of Franklin’s photograph. She initialed the other photographs indicating that she had viewed them. Upon viewing the second line up the victim started shaking as she positively identified the photograph of the defendant. She signed, dated and noted the time on the back of defendant’s photograph. She initialed the other photographs indicating that she had viewed them. Arrest and search warrants were obtained for both suspects. Two white t-shirts and a pair of jeans were seized from the defendant’s home. One t-shirt appeared to have red stains on it. No weapons or other evidence was found. The defendant was not home at the time of the search but later that evening he turned himself into the police. Franklin was arrested at his home; nothing was seized from his residence.
On cross-examination, Detective McCleary stated that the crime lab collected all evidence at both crime scenes, all blood samples tested positive for the victim’s blood, and no seminal fluid was found. He conceded that although several fingerprint samples were examined, they did not match the defendant and one blood smudged fingerprint revealed male DNA, but excluded the defendant. Detective McCleary also stated that in his communications with the victim, she did not give a description of defendant’s hair or his hair style but that the individuals in the photographic line-up were wearing short twists in their hair because the most recent photo of defendant showed him wearing short twists. In addition, Detective RMcCleary testified that the victim mentioned that Franklin asked the defendant for a con *1035 dom but did not know if either man wore a condom during the assault.
On re-direct examination, Detective McCleary stated that he was not surprised that the fingerprints did not reveal a match to defendant or Franklin because the crime scene was a public place visited by many people. On re-cross examination, he conceded that thirty latent fingerprints were recovered from the outside door to the art center and that none was a match to defendant.
Alyson Saadi, a DNA analyst with the State Police Crime Lab, testified that he tested the victim’s shirt, underwear, jeans and tennis shoes, as well as the defendant’s jeans and t-shirt, several cuttings from an office chair, various swabs of blood, suspected body fluids taken from the floor of the office, and a latent fingerprint on an exterior door. All the blood samples tested positive for the victim. The latent fingerprint tested positive for the victim’s DNA profile and that of an unknown male. The male DNA was compared to that of defendant and Franklin; both were excluded. The blood swab from the bottom of the right tennis shoe also showed an unknown male profile which was not suitable for comparison. A hair was recovered from the zipper of the defendant’s jeans but it was not a match to the victim.
On cross-examination, Ms. Saadi confirmed that the male DNA sample on the bottom of the victim’s shoe excluded the defendant and the hair taken from defendant’s jeans also excluded the victim. On re-cross examination by the state she stated that the hair found on defendant’s jeans was a long brownish colored hair and on re-recross examination by the defense she stated that mitochondrial tests showed that the hair was not a match to the victim or any of her relatives.
17Tanesha Santemore, a criminalist with the New Orleans Police Department, testified that she tested a black cotton sports bra, a pair of white cotton underwear, a cotton t-shirt and a pair of orange and yellow tennis shoes taken from the victim. Blood was found on the tops and bottoms of both of the tennis shoes, the underwear, the jeans, and the t-shirt. No blood was found on the bra. Hairs were also found on several items but were not tested. Cuttings of reddish stains were taken from the defendant’s t-shirt and locked in the lab for further testing. However, because of the destruction to the lab which occurred in the aftermath of Hurricane Katrina, no testing was possible.
On cross-examination by the defense, Ms. Santemore testified that the reddish stains could have come from sources other than blood.
Sergeant Robert Blanchard, day watch supervisor of the New Orleans Police Department Evidence and Property Division, testified that following the aftermath of Hurricane Katrina most of the evidence stored in the evidence and property room was destroyed, floated away, or was unable to be identified.
Anna Duggar, director of the New Orleans Police Department Crime Lab, testified that in June 2005 she was a criminalist assigned to the forensic light unit and that her specialization was blood spatter pattern analysis, latent fingerprint analysis and comparison, serology, DNA preparation and analysis of hair and fiber evidence. She stated that she examined the crime scene in this case for body fluids and that fluorescence tests indicated possible evidence of saliva, seminal fluid or urine. In addition, two latent fingerprints were recovered from the outside office door where the rapes occurred.
On cross-examination, she stated that the latent fingerprints were subsequently *1036 found not suitable for comparison, thirty additional latent fingerprints |slifted from the crime scene were compared to defendant but none matched, and seven suspected semen stains were recovered but none was positive for semen.
Betty Jo Mitchell, a forensic sexual assault nurse examiner, testified that on June 19, 2005, she examined the victim at Charity Hospital’s emergency accident room. The victim had a severe laceration to the face and was hysterical. She told Nurse Mitchell that she had been penetrated orally, vaginally and anally, and that the attackers used a condom during the vaginal and anal assaults. Nurse Mitchell collected trace evidence samples and swabs from the victim’s hair, mouth, fingernails, vagina and rectum. The victim’s body was examined with a strobe light for the presence of semen and other body fluids. No tears were found in the vagina. A polyp was observed inside the vaginal vault which was broken and bleeding. The victim’s cervix was red which indicated trauma. The anal exam did not reveal any tears, abrasions, redness or swelling.
On cross-examination by the defense, Nurse Mitchell stated that no forensic evidence was found in the victim’s hair and none of the swabs tested positive for semen. No body fluids were found on the victim’s body.
The victim testified that on June 19, 2005, at approximately 1:00 p.m., she was a senior curator for the Newcomb College Art Gallery at Tulane University, working in her office in the Woldenberg Art Center. She heard a knock on the door, and a voice asked, “Can you tell me where room 215 is?” She answered through the door, “It’s upstairs on the second floor.” Within seconds, she heard a second knock at the door. A voice said, “We can’t find 215.” She opened the door and saw Hampton Franklin standing in the doorway, wearing a white t-shirt and white jeans. Franklin said, “I’m looking for 215.” She answered, “You have to go upstairs.” Franklin replied, “Well, in that case, give me all your money, bitch. 19Give me all your money, bitch.” Franklin lifted up his shirt and showed her a semi-automatic pistol. Dumbfounded, she stood in the doorway trying to understand what was happening. At that point she saw the defendant standing at the end of the hallway wearing a white t-shirt and dark blue jeans. Franklin moved toward her and ran into the office, then the defendant followed and slammed and locked the door.
The defendant ordered the victim to sit on the floor. He placed the muzzle of a gun on the top of her head. Franklin screamed, “Where is your money, bitch? I know you got money in here. Where is your money?” She responded that she only had thirteen dollars in her pocket; he demanded it, and she gave it to him. Franklin ransacked the office looking for valuables. Defendant told the victim, “I know you must think that you are having a crappy Father’s Day, but we ain’t got no fathers.” They asked the victim for her purse and she responded that she carried a knapsack, not a purse, and that the knapsack was inside her car. The defendant demanded her car keys and a description of her car. When she replied with the information, he accused her of lying and struck her across the face with the barrel of the gun. She told him that she was not lying. He grabbed the car keys from her desk. He ordered the victim not to look at him and placed the gun to her temple. Franklin screamed that the victim was going to call the police. She assured them that she would not. Franklin continued screaming that she was going to call the police; he picked up her desk phone and ripped it out of the wall. The defendant *1037 kept the gun to her head. Franklin then went inside ■ the annex where office and reception equipment and supplies were stored. The defendant said, “Well, now you can suck my dick.” He then forced the victim to perform oral sex on him while holding the gun to her temple. After a short while, defendant moved to one [inof the office chairs. Because he was not circumcised he gave the victim instructions about how to pull the skin back from his penis, to use her hands and to watch her teeth. Franklin returned to the office carrying a bottle of Courvoisier liquor and a digital camera. He asked the defendant if he had a condom; the defendant took one out of his pocket and handed it to Franklin. Franklin ordered the victim to stand up and remove her pants. When she did not pull them down far enough, he grabbed them and pulled them down to her knees. He pushed her back down onto defendant’s lap, put on the condom and raped her anally. The defendant and Franklin then changed positions with Franklin sitting in the chair. Franklin grabbed the victim’s head and pushed it into his lap. At this point, she lost her balance and brushed against the gun; Franklin threatened her about reaching for the gun. The defendant put on a condom and raped the victim vaginally and anally.
The victim described the rapes as becoming more violent and vicious. She felt that she was going to die. Something inside of her snapped and she decided that if she was going to die she was not going down as a lamb. She put her hands underneath the chair and with all of her strength she threw the chair over knocking Franklin onto his back. She grabbed her pants, turned around, and looked at the defendant. She described defendant as looking dumbfounded and kind of confused, like this was not part of the plan. Observing that the gun was now lying on the arm of the chair, the victim ran towards the door. In an attempt to flee, the defendant ran past her and knocked her back into the door and wall. Franklin ran past her knocking her back into the office. Before he fled, Franklin picked up the gun and smashed her face, breaking her nose. She slammed the door and locked it.
| nThe victim stated that she was able to clearly see both men. She described the lighting conditions as good with both natural light from a window and light from two lamps.
She was bleeding profusely and, realizing that she could not use the phone, she walked around the office fearing that her attackers were outside in the hallway. When she did not hear any sounds from the hallway, she opened the door and ran out of the building. Using an emergency telephone she called the Tulane University Police and reported that she had been robbed. A Tulane police officer transported her to Baptist Hospital where she told the officer that she had been raped. At the hospital, three police officers interviewed her and took her statement. She described her attackers as two black teenagers between the ages of seventeen and nineteen and approximately five foot seven and five foot eight inches in height. She described Franklin as having a darker complexion than the defendant. Subsequently, she was transported to Charity Hospital for a rape examination. Detective McCleary interviewed her at Charity Hospital.
On the Thursday following the rapes, Detective McCleary contacted the victim, informing her that he had some photographs he wanted her to view. He came to her home with another detective. He gave her a manila folder, and said, “Could you please open it and look at it and see if you see anyone familiar?” Upon viewing *1038 the first photographic line-up, the victim immediately and positively identified Franklin as the attacker who wore the white t-shirt and white pants. Upon viewing the second photographic line-up, she immediately and positively identified the defendant as the attacker who wore the white t-shirt and dark jeans. She signed and dated the backs of both photos.
[iaOn cross-examination, the victim positively identified the photographic line-ups shown to her by Detective McCleary and also positively identified the defendant’s photograph. She admitted identifying the defendant as wearing his hair in twists when he raped her. She stated that Franklin was wearing short cropped hair and when the defendant ran into her office she observed that he was holding a gun. The victim testified that the defendant was not wearing a condom during fellatio but was wearing a condom when he sodomized her. Finally, she agreed that she lacked knowledge as to the growth rate of African-American hair.
On re-direct examination, the victim stated that when she testified at the November 2, 2006, motion hearing she described the defendant’s hair as Chee Weez, twists, twigs or short-twisted braids. She described the defendant’s hair in the photographic line-up as twisted braids.
On re-cross examination, the victim described Franklin’s hair as close-cropped and defendant’s as twigs. She did not observe either man as having tattoos, facial hair, scars or other distinguishing marks.
Samuel Gore, medical examiner at Orleans Parish Prison, testified that he examined the defendant and Franklin and determined that neither were circumcised.
Professor Stephen Durow testified that he was a graduate student in fine arts at Tulane University and at work in his studio in the Woldenberg Art Center on the day the victim was robbed and raped. While walking down the hallway towards the restroom, he observed two men exiting from the area of the victim’s office carrying bags. Both men were looking around to see if anyone was in the hallway and, because of their demeanor, Durow suspected that they had burglarized the office. Upon seeing Durow, the men ran out of the building; Durow ran after | isthem. He described the men as thin, one slightly taller than the other with short hair. He chased them for about two and one-half blocks down Plum Street towards Broadway. During the chase one of the men turned and pointed what appeared to be a toy gun at Durow. At the corner of Plum and Broadway Streets, the men dropped the items they were carrying. When Du-row realized that he was not going to catch them, he discontinued the chase. Durow observed a plastic toy gun wrapped in electrical tape and several bottles of wine lying on the ground. Fearing the plastic gun would become contaminated, Durow used his pen to pick it up. He carried it back to the campus and turned it over to the Tulane Police. The following morning, news of the rape was televised and a Tulane Police officer contacted Durow to ask if he had seen the news footage of the two arrested suspects. He informed the officer that he only saw the end of the news, but that one of the men looked familiar. He was not sure of the other man. Subsequently, Detective McCleary showed him the news footage again. Durow confirmed that both suspects looked like the two men that he chased from the art center. Detective McCleary did not suggest in any way who the two men were or what he should say. In court, Durow positively identified the defendant as one of the two men he chased from the art center.
On cross-examination, Durow stated that he remembered that one of the men *1039 wore a black t-shirt, that both wore jeans, and that both had short cropped hair. One had light facial hair which looked like a goatee. He testified that he did not know if the gun was a toy but that “something didn’t look right about it ... It just didn’t look like a real gun.” That night he was interviewed by Detective McCleary and gave him a statement. He was never shown either a live or a photographic 114line-up. Durow testified that he got more than a fleeting look at defendant because the defendant kept turning around to see if he was still chasing him.
On re-direct examination, Durow stated that the first night he viewed the televised news coverage he recognized that one of the suspects arrested for the rape was one of the men he chased from the art center.
Detective Kristi Bagneris of the NOPD testified that on June 23, 2005, she received a call from the second district station that an individual, later identified as the defendant, wanted to turn himself in. A check of the defendant’s name revealed that there was an outstanding warrant for his arrest. He was relocated to the sex crimes division at police headquarters. On the face sheet, Detective Bagneris did not note that she observed any obvious tattoos or facial hair on defendant.
On cross-examination, Detective Bagner-is conceded that on the face sheet she noted that the defendant was an African-American male with a medium build, brown eyes with a short hairstyle. She did not note any tattoos, facial hair or braided hair.
Counsel for the defendant argues that this evidence is insufficient because the defendant is the victim of misidentification; specifically, counsel argues that the eyewitness testimony of the victim and Du-row, without corroborating forensic evidence, does not prove that the defendant was the person who robbed and raped the victim. He suggests that the evidence is exculpatory because it does not negate the possibility that two different men committed the crimes, and that, if Durow saw the defendant leaving the art center with stolen items, the defendant is a thief but not a rapist. In support, counsel points to discrepancies in the victim’s and Durow’s description of the him. The victim described the defendant as clean |1fishaven, without tattoos, wearing twisted braids in his hair and dressed in a white t-shirt and blue jeans. Durow described the defendant as having a goatee, close cropped hair and wearing a dark t-shirt and blue jeans. Furthermore, counsel maintains that Durow’s testimony fails to establish a temporal proximity between the defendant and the area of the rapes. He also asserts that the defendant had tattoos on both of his forearms at the time of his trial, and refers to the campus surveillance video[4] of the defendant showing that three days prior to the crimes defendant had a beard and close cropped hair which would have been too short to wear in twisted braids. Counsel argues that these obvious inconsistencies render the eye-witness testimony suspect, and that the jury could not rationally have concluded that defendant robbed and raped the victim.
The defendant argues pro se that at the motion to suppress hearing, the victim identified suspect number 360020500266 in photograph number 6 in the photographic line-up as her attacker instead of the defendant whose suspect number was 360020412717 in photograph number 5 in the line-up.[5] This is reflected in the vic *1040 tim’s testimony at the motion hearing. However, Detective McCleary’s report clearly shows that “Main opened the folder and, again, slightly gasped, and began to shake. She immediately pointed at picture number five, Wilson’s picture, and identified him as the other person who had attacked her.” At trial, the victim was shown defendant’s photograph from the line-up and asked:
Q. Okay. And what is this?
A. That is the second folder that I opened.
Q. Okay. And did you identify anybody on this lineup?
I iqA. I did.
Q. And who is it that you identified?
A. The person on the bottom row in the middle.
Q. Who is that person?
A. The defendant.
Q. Okay. And did Detective MeCleary ask you to do anything after you identified him?
A. He asked me to turn it over and sign my name and date on the back of the picture that I identified.
Q. Okay. When I turn this over, do you see anything?
A. I see my name printed, my signature, the date and the time that I identified him.
Q. And is that on the back of the picture of the defendant?
A. Yes, it is.
Furthermore, the victim, without hesitation, positively identified defendant at trial as her attacker. Accordingly, the defendant’s contention that the victim identified someone else as her attacker is not supported by the record.
The victim in this case was raped by the defendant and Franklin for over twenty minutes in her office, which was illuminated by both natural and artificial light. The defendant spoke to the victim several times and made no attempt to disguise his identity. The victim’s description of defendant’s age, weight and height were accurate. She described the attackers as ransacking the office and taking bottles of Courvoisier from the annex. Courvoisier liquor was the same brand dropped by the men chased off the campus. Durow testified that he saw the defendant and Franklin coming from the area of the victim’s office, thereby establishing proximity to the crimes. In the hallway he got a full frontal view of 117both men and made eye contact with them before they fled. He testified that he got another look at defendant’s face during the chase when the defendant turned around and pointed a gun at him. He was certain that he could identify the two men if he saw them again. Within days of the crime, Durow positively identified the defendant and Franklin from the television news footage. A tip from crime stoppers provided independent information as to the identity of the perpetrators which led to the photographic lineups shown to the victim by Detective MeCleary. Upon viewing the photographic line-up and without any prompting, the victim immediately and positively identified the defendant as one of the men who robbed and raped her. She steadfastly maintained her identification of defendant and positively identified him at trial. Upon his arrest and booking, Detective Bagneris did not observe any tattoos on defendant. Interestingly, the defendant does not argue that the campus surveillance video shows him as having tattoos on his forearms.
*1041 The victim testified that defendant was armed with a gun. The defendant and Franklin demanded money from the victim and took thirteen dollars and some change from her pocket, a camera and bottles of Courvoisier liquor from the victim’s office area and adjoining annex.
The victim testified that the defendant and Franklin entered her office brandishing guns and that each threatened her and forced her to engage in oral, anal and vaginal sexual intercourse. Betty Jo Mitchell, the sexual assault nurse, testified that the results of rape examination were consistent with the victim’s account of the rapes. Furthermore, the medical report of the victim’s broken and lacerated nose was consistent with the victim’s testimony that the defendant struck her with a gun. The victim had the opportunity to view the defendant for more | isthan twenty minutes in a well lit office during daylight hours. The victim immediately and positively identified defendant in a photographic lineup (photograph number 5) four days after the rapes. The defendant has not alleged that the photographic line-up was suggestive or unconstitutional. Both the victim and Durow positively identified the defendant at trial. The jury was well aware of the discrepancies in the physical descriptions of the defendant by the victim and Durow, but weighed their testimony and found them to be credible. Given the facts of this case, we do not find that the jury abused its discretion by finding the identifications of the victim and Durow credible. Thus, there was sufficient evidence to negate any possibility of misidentification, and the evidence presented at trial supports the jury’s finding that defendant was the person who robbed and raped the victim. The jury’s credibility finding was clearly not contrary to the evidence presented at trial. The State presented sufficient evidence to support the defendant’s convictions for aggravated rape and armed robbery and, accordingly, there is no merit to this assignment of error.

Errors Patent

A review for errors patent reveals an error in the defendant’s sentence for armed robbery. A person convicted of armed robbery shall be imprisoned at hard labor for not less than ten years and not more than ninety-nine years, without benefit of parole, probation or suspension of sentence. La. Rev.Stat. 14:64(B) (emphasis added).
In the instant case, the district court failed to deny the defendant benefits on his armed robbery conviction and, accordingly, the defendant’s sentence is illegally lenient. However, in instances where the statutory restrictions were not recited at sentencing, they are contained in the sentence, whether or not imposed |10by the sentencing court. La. Rev.Stat. 15:801.1(A); State v. Hall, 2002-1098 (La. App. 4 Cir. 3/19/08), 843 So.2d 488.

Conclusion

The defendant’s convictions and sentences are affirmed.
AFFIRMED.

. La. Rev.Stat. 14:64 defines armed robbery as the taking of anything of value belonging to another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

. La. R.S. 14:42 defines aggravated rape, in pertinent part, as the anal, oral or vaginal sexual intercourse deemed to be without lawful consent of the victim because it was committed when the victim is prevented from resisting the act by threats of great and immediate bodily harm, when the victim is prevented from resisting the act because the offender is armed with a dangerous weapon, or when two or more offenders participated in the act.

.On July 20, 2009, the state amended the aggravated rape charge (count two) to forcible rape (La. Rev.Stat. 14:42.1) as to Franklin. Franklin pleaded guilty as charged to armed robbery (count one) and guilty to the amended charge of forcible rape. On July 22, 2009, he was sentenced on count one to serve fifty years at hard labor with credit for time served but without benefit of parole, probation or suspension of sentence. The sentence was ordered to be served concurrent with his sentence in count two and with any other sentence. On count two he was sentenced to serve forty years at hard labor with credit for time served but without benefit of parole, probation or suspension of sentence.

. The video was shown to the jury at trial.

. State’s exhibit, S-4, the photographic lineup, was requested by counsel in July 2009 *1040 and again by this court on November 18, 2009, but the exhibit was not found.