WILLIAMS, J.
hThe defendant, Brandon Dickson, was charged by bill of information with aggravated burglary, a violation of LSA-R.S. 14:60, conspiracy- to commit aggravated burglary, LSA-14:26 and 14:60, unauthorized use of an access card as theft, LSA-R.S. 14:67.3, and armed robbery, LSA-R.S. 14:64. Following a jury trial, the defendant was convicted of aggravated burglary, unauthorized use of an access card and attempted armed robbery. The defendant received a sentence of 34 years at hard labor without the benefit of parole, probation or suspension of sentence for his attempted armed robbery conviction and 3 years at hard labor for his unauthorized use of an access card conviction. At the sentencing hearing, the trial court initially sentenced the defendant to 20 years at hard labor for his aggravated burglary conviction, but later stated that the sentence was 25 years at hard labor. The trial court ordered all three sentences to run concurrently to one another. For the following reasons, we affirm the defendant’s convictions and the sentences imposed for attempted armed robbery and unauthorized use of an access card. We vacate the sentence for aggravated burglary and remand for resentencing.
FACTS
The victim in this matter, Victor Cascio, testified at trial that on August 22, 2013, at around 11:00 p.m., he was asleep in his home on Glenmar Street in Monroe, Louisiana, when he was awakened by his dog barking. Cascio got up to investigate and when he walked out of his bedroom he saw an African-American male in a red shirt standing in the hallway near the two spare bedrooms. Cascio asked the man what he was ladoing in his house. The man responded by pulling out a gun and instructing Cascio to get down on the floor. Cas-cio refused and told the man to leave. The intruder then rushed toward Cascio, pointing the gun at his head, and again commanded him to get on the floor as three other people emerged from the other bedrooms. One of the others, an African-American male who was wearing a hooded shirt which covered his head, walked over and stood next to the man with the gun. A Caucasian woman also walked over next to the man with the gun and the third person, another Caucasian woman, headed toward the front door of the house. After the man with the gun threatened to “pop a cap” in Cascio, he told the man that he had cash in his bedroom in a pair of pants. Cascio led the man to his bedroom, but one of the women had already entered the bedroom and locked the door. The man with the gun kicked the door open just as the woman was leaving the house through a set of french doors. The other intruders then fled and Cascio went next door to his mother’s house and called the police.
*1245 Cascio testified that his wallet, cell phone and three packs of cigarettes were missing from his house. His wallet had contained a debit card, a bank credit card, two American Express credit cards, a Mastercard credit card and identification cards at the time of the crime. Additionally, two of Cascio’s televisions were pulled out from the wall, but had not been disconnected from their wall mounts. Following a police investigation, Cascio identified his recovered cell phone and credit cards, as well as three receipts from Wal-Mart, dated August 23, 2013, near 1:00 a.m., showing his name and the last four digits of two of his credit cards. The receipts | ¡¡revealed that approximately $600.00 had been charged on Cascio’s credit cards. At trial, Cascio acknowledged that after the burglary he was unable to identify the defendant as one of the intruders from a photographic lineup of potential suspects. Cascio explained that he tried not to look at the burglars’ faces because he was afraid that they would kill him if they thought he could identify them later. However, Cas-cio testified that the handgun recovered from defendant’s house looked like the one used during the crime.
Monroe Police Officer Mickey Tucker, along with Sergeant Reddick, responded to Cascio’s home a little after 12:30 a.m. on August 23, 2013. Officer Tucker interviewed Cascio, who described the four suspects as a muscular man with short hair wearing a red shirt with a logo and holding a revolver, a woman with dirty blonde hair in a braided pony tail, another woman with black hair, and a second man.
Monroe Police Sergeant Mark Nappier secured the scene outside Cascio’s house and noticed a man at the end of the driveway walking a dog. The man told Sergeant Nappier that he saw a white Jeep Cherokee leave the victim’s house • at a rapid speed and provided the jeep’s license plate number. Sergeant Nappier called a police dispatcher who issued a “be on the lookout” or “BOLO” for the vehicle.
Monroe Police Officer Easley Hollis heard the BOLO while on patrol and noticed a white Jeep Cherokee with a license plate number matching the one described in the BOLO at a Valero gas station on Martin Luther King, Jr. Drive in Monroe. Additional police officers responded to the gas station | ¿and arrested the vehicle occupants, Charlie Mitchell, Christina Self, Joseph Miller, Nicole Myers and the defendant. Officer Hollis transported Christina Self to the police station; he noticed that she left a cell phone behind in his police vehicle. Monroe Police Officer Kevin Cope transported Nicole Myers[1] from the Valero gas station to the police station. Myers had Cascio’s.Wal-Mart credit card in her front pocket.
Christina Self testified that on the evening of August 22, 2013, Joseph Miller drove her and Mitchell in the white Jeep Cherokee from a motel to the house where defendant and Nicole Myers lived. When asked by the prosecutor if she was certain that the defendant lived in the house with Myers, Self began to respond by stating, “Actually when he was locked up ...” and the defendant immediately objected. The defense requested a mistrial on the ground that Selfs testimony made reference to the defendant’s . prior criminal history. The trial court denied the motion, explaining that the comment did not rise to the level of depriving the defendant of a fair trial. *1246 The jury was admonished to disregard the last question and answer.
Self continued her testimony as follows: the defendant was wearing a red shirt and blue jeans when they left for Cascio’s house. She identified a red shirt in a police photo from the defendant’s house as the shirt worn by the defendant during the burglary. The group arrived at Cascio’s house after dark and parked two houses down the street. Self knocked on the Ifidoor, but there was no answer so she and Myers found an unlocked window and Self climbed into the garage. The door into the house was unlocked and Self went inside and let the defendant and Myers in through the front door. Mitchell stayed in the car until later. Myers and the defendant went into the spare bedrooms to try to disconnect the televisions from the wall. A short time later, Cascio came out of his bedroom and the defendant pointed a revolver at Cascio. Mitchell appeared at the front door and told Self to get out of the house, but she ignored him. Cascio told the defendant that he had money in his pants, which were in his bedroom. Self immediately ran into Cascio’s bedroom, locked the door, grabbed Cascio’s cell phone and wallet, and left the house through a door in Cascio’s bedroom. She then ran down the left side of the house and got into the Jeep Cherokee. Miller was still sitting in the driver’s seat and Mitchell had also returned. Moments later, the defendant and Myers climbed into the back seat with Self.
Miller drove to Wal-Mart where Self and Myers went inside to purchase items with Cascio’s credit cards while Miller, Mitchell and the defendant waited in the car. Self used Cascio’s American Express credit card to purchase an iPod, some tennis shoes and a shirt. Myers used another one of Cascio’s credit cards to buy a game system, a phone and some snacks. Then the group drove back to the defendant’s house, where they left their newly acquired items. The defendant changed his shirt and everyone left to go to another Wal-Mart in West Monroe. Miller stopped at a Valero gas station to get gasoline and Self bought two lighters. After Self returned to the jeep, several police cars arrived and everyone in the group [ftwas arrested.
On cross-examination, Self admitted that she initially told police that Mitchell, and not the defendant, was the one who confronted Cascio during the burglary and tried to get him on the floor. However, Self stated that her previous statement was inaccurate. Self also admitted to previously being convicted of possession of cocaine in 2006, forgery in 2009 and possession of cocaine again in 2011. Self did not know if "she was being charged as a habitual offender, but said that the state had offered her a plea agreement in exchange for her truthful testimony at the defendant’s trial.
Mitchell testified at trial as follows: on the evening of August 22, 2013, he, Self, Miller, the defendant and Myers met at the defendant’s house and discussed robbing Cascio. The defendant then told Miller to go to Wal-Mart to buy latex gloves. When he returned, Miller drove the group to Cascio’s house. The defendant and Myers both put on latex gloves before entering Cascio’s house, but neither Mitchell nor Self wore gloves. The defendant had his gun in his pocket, but when Cascio came out of his bedroom the defendant pointed the gun at him and yelled at him to get on the floor. Mitchell, who stayed in the threshold of the front door, yelled at his girlfriend, Self, that they needed to get out of there and he ran out of the house. When the others returned to the jeep, Miller drove the group to Wal-Mart. After he was arrested, Mitchell told police *1247 that the defendant was the mastermind of the scheme to rob Cascio. Mitchell was wearing an orange/red shirt with a logo on the front that night and the defendant was wearing a red shirt. Mitchell also identified photographs of the red shirt the |7defendant had worn during the crime. Mitchell admitted that he was previously convicted of simple burglary in 2002 and possession of cocaine in 2010. Mitchell had accepted a deal with the state providing that he would receive a 10-year sentence for his participation in the burglary in exchange for testifying truthfully at the defendant’s trial.
Joseph Miller testified as follows: he drove his white Jeep Cherokee to Glenmar Street on the night of August 22, 2013. Before leaving for Cascio’s house, Miller was sent to Wal-Mart to purchase latex gloves and duct tape. Miller did not see the defendant or Myers enter Cascio’s house. After Myers, Mitchell, Self and the defendant returned to the jeep, Miller drove to Wal-Mart and then back to the defendant’s house, where he saw the defendant wipe a gun clean. Afterwards, Miller drove the group to a Valero gas station where he used Cascio’s credit card to purchase gasoline.
During his testimony, when asked whether he had been living with the defendant and Myers before August 22, 2013, Miller stated, “Mr. Dickson was in Rich-wood Correctional Center at the time[.]” The defendant objected and made a second motion for a mistrial. The trial court deferred ruling on the motion until after Miller finished testifying. Miller continued his testimony, explaining that after his arrest, while in jail, he prepared affidavits in relation to this case. The state asked if he discussed the affidavits with any of his co-defendants and whether the defendant was in the same jail “pod” as Miller, who responded that the defendant “was on another side” of the jail. The defendant objected, making a third motion for a mistrial. The defendant argued that the state had elicited information from |sMiller that the defendant was in jail. The state argued that the reference did not constitute other crimes evidence because the referenced incarceration was in relation to the defendant’s participation in the instant crime. The court took the matter under advisement. The next day, the trial court denied the defendant’s second and third motions for a mistrial, explaining that Miller’s references to defendant’s incarceration did not rise to the level of creating substantial prejudice to the defendant. The defendant opted not to have the trial court admonish the jury.
In his testimony, Miller admitted to being convicted of misdemeanor shoplifting, criminal trespass and public intoxication in 1996, simple burglary in 2006, and four other felony convictions in North Carolina. Miller stated that he had not accepted a plea agreement at the time of trial, but that he was in the process of negotiating one.
Monroe Police Detective Dwayne Crow-der testified as follows: he and Detective Jeremy Kent took the statement of defendant and the other suspects after their arrest. Detective Crowder advised the defendant of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant waived his rights and spoke with the police, but did not provide any information about the crime and denied any involvement in the burglary, robbery or use of Cascio’s credit cards. In a search of the residence on South 26th Street in Monroe, police found a utility bill mailed to the defendant’s name at that address. A silver Smith & Wesson .367 caliber revolver, ammunition, a PlayStation 3, an Android tablet, an AT & T GoPhone and the Wal-Mart receipts were *1248 also found at the ^residence. Although fingerprints were taken at the crime scene, there was insufficient detail to link the fingerprints to any person. No fingerprints were found on the gun recovered from the defendant's house; the gun appeared to have been wiped clean.
During cross-examination, when talking about interrogation techniques, Detective Crowder stated, “There’s been prior dealings with Mr. Dickson we understand more[.]” Again, the defendant objected, and requested his fourth motion for a mistrial, pointing out that the defendant’s recorded statement had been redacted to remove a similar statement made by police during' his interrogation. After some discussion, the trial court granted the motion, explaining that the cumulative effect of all of the references to the defendant’s criminal history warranted a mistrial. In particular, the trial court noted:
So in isolation you can say well, you can infer something else. I don’t think’ you can, but even if you — if I accept your argument that yod can you couple that with the two other admissions from the other witnesses that he was locked up there’s no other logical conclusion that the jury is going to draw other than this man has a criminal record or has criminal history other than — they’re going to — they’re going to take into the jury room information other than this case, and they’re going to take into the jury room a belief that this man is involved in criminal activity other than this. There’s no other logical thing they can do.
I’m the gatekeeper of making sure this man has a fair trial and that there’s not substantial prejudice to him. I understand that the mistrial is a drastic remedy and is only afforded in limited circumstances, but this case has a history, this trial has a history.
The trial court additionally expressed its continued frustration with the state’s failure to prepare its witnesses and specifically warn them not to | inmention the defendant’s prior criminal behavior.
The state noted its intention to seek expedited supervisory review of the trial court’s ruling and the case was stayed. This Court granted the state’s writ application, reversed the trial court’s ruling granting the defendant a mistrial, and remanded the case for further proceedings. This Court also specifically noted that the defendant was not precluded from raising the issue again on appeal upon a proper showing under the doctrine of the law of the case.
Nicole Myers testified that she is married to the defendant, but that they had not lived together since the previous April. She further stated that Self and Miller were living with her at the time of the burglary and that anything found at her house did not belong to the defendant. She also said that the defendant'was not there at the time of the burglary.'
On cross-examination, Myérs admitted that the electric bill was in the defendant’s name, but explained that he allowed her to put the account in his name because she had an outstanding bill. She also acknowledged that she is not “legally married” to the defendant, but used his last name when she was arrested because she had prior charges. Although she initially told police that she knew nothing about the burglary, at the defendant’s trial she admitted to standing in the doorway of Cas-cio’s house during the burglary, but said she never actually entered the home. She also testified that Miller was next to her at the door and that Mitchell was the one who had confronted the victim with the gun. After Self took Cascio’s wallet, the four of them went to Wal-Mart to buy items with Cascio’s credit cards. Then, *1249 Inthey went back to Myers’ house and left their newly purchased items in a closet. According to Myers, the group left to go to the West Monroe Wal-Mart and Miller picked the defendant up on the corner just before going to the Valero to get gasoline.
After hearing the evidence, the jury found the defendant guilty of aggravated burglary, unauthorized use of an access card and attempted armed robbery; he was found not guilty of conspiracy to commit aggravated burglary. At sentencing, the trial court initially imposed a 20-year hard labor sentence for the defendant’s aggravated burglary conviction. However, moments later, the trial court imposed a sentence of 25 years at hard labor for aggravated burglary. The defendant’s motion to reconsider sentence was denied and this appeal followed.
DISCUSSION ■
The defendant contends several of the state’s witnesses improperly referred to other crimes that he committed. Defendant argues that he should have been granted a mistrial because those three references to his prior criminal acts deprived him of his right to a fair trial.
In State v. Smith, 43,136 (La.App.2d Cir.4/23/08), 981 So.2d 200, 202-03, this court stated:
La. C.E. art. 404(B) provides that .evidence of other crimes, acts or wrongs is generally not admissible. La. C. Cr. P. art. 770(2) provides that a mistrial shall be granted upon motion of the defendant when a remark or comment is made within the hearing of the jury by the judge, district attorney, or a court official during trial or in argument and that remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. State v. Ellis, 42,520 (La.App.2d Cir.09/26/07), 966 So.2d 139. For purposes of article 770, a law enforcement officer is not l12considered a “court official,” and an unsolicited, unresponsive reference to other crimes evi-denc¿ made by a law enforcement officer is not grounds for a mandatory mistrial under La. C. Cr. P. art. 770. State v. Ellis, supra; State v. Scott, 34,949 (La.App.2d Cir.01/25/02), 823 So.2d 960, writ denied, 02-1622. (La.05/16/03), 843 So.2d 1122.
La. C. Cr. P. art. 771 sets forth permissive grounds for requesting an admonition or a mistrial when a prejudicial remark is made on grounds that do not' require automatic mistrial under article 770. La. C. 'Cr. P. art. 775 also sets forth additional permissive grounds for mistrial. Under these articles, mistrial is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Ellis, supra. Moreover, mistrial is a drastic remedy which is only authorized where substantial prejudice will otherwise result to the accused. State v. Kemp, 39,358 (La.App.2d Cir.03/11/05), 896 So.2d 349, unit. denied, 05-0937 (La.12/09/05), 916 So.2d 1052. A trial court’s ruling denying mistrial will not be disturbed absent an abuse of discretion. State v. Givens, 99-3518 (La.01/17/01), 776 So.2d 443, appeal after remand, 04-0765 (La.App. 4th Cir.10/27/04), 888 So.2d 329, unit denied, 04-2919 (La.03/18/05), 896 So.2d 1003, cert. denied, 546 U.S. 867, 126 S.Ct. 154, 163 L.Ed.2d 154 (2005); State v. Taylor, 30,310 (La.App.2d Cir.02/25/98), 709 So.2d 883.
Even if a mistrial was warranted under article 770, 771, or 775, the failure to grant a mistrial would not result in an automatic reversal of defendant’s conviction, but would be a trial error subject to *1250 the harmless error analysis on appeal. State v. Givens, supra; State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Trial error is harmless where the verdict rendered is “surely unattributable to the error.” State v. Johnson, supra.
The defendant cites State v. Franklin, 440 So.2d 223 (La.App. 3d Cir.1983), writ denied, 444 So.2d 1241 (La.1984), and State v. Carter, 97-1096 (La.App. 4th Cir.5/20/98), 713 So.2d 796, writ denied, 98-1538 (La.11/6/98), 726 So.2d 920, for instances where the court granted a mistrial based on the cumulative effect of several references by state’s witnesses to a defendant’s prior crimes.
| 1sThe situations in the cases cited by defendant can be distinguished from that of the present case. In Franklin, supra, the prosecutor referenced other crimes evidence during his opening statement in the defendants’ trial. Additionally, two other witnesses referred to previous crimes committed by the defendants. All of the comments referred to allegations that the defendants, who were charged with receiving stolen things, had consistently received stolen items in the past from the same source. The Louisiana Third Circuit Court of Appeal held that the cumulative effect of the other crimes references prejudiced the defendants. In Carter, supra, the accused was charged with forcible rape and aggravated oral sexual battery. At trial, the victim made three comments involving allegations that the defendant had raped her in the past, beaten his late wife, and had possibly been involved in a robbery. The trial court also allowed the state to further question the victim regarding the alleged prior rape. Additionally, the defendant’s sister stated that the district attorney had inquired as to whether the defendant had ever beaten his late wife. The Louisiana Fourth Circuit Court of Appeal concluded that the repeated unresponsive comments by the victim and witness, and the nature of the prior offenses alleged, “very likely affected the verdict, especially considering that the physical evidence provides little corroboration of P.C.’s version of the incident.”
This court previously reviewed the district court’s ruling to grant a mistrial based on references to other crimes when the state filed a writ application during trial. The law of the case doctrine provides that this Court may in its discretion revisit an issue on appeal that has previously j Mbeen decided on a writ application. Robideau v. Johnson, 31,770 (La.App.2d Cir.3/31/99), 731 So.2d 955, writ denied, 99-1564 (La.9/17/99), 747 So.2d 562. A review of the full record on appeal demonstrates that no mistrial is warranted in this case.
Although the witness references to defendant’s prior incarceration and Detective Crowder’s remark relating to “prior dealings” with him likely influenced the jury’s perception of the defendant, the record shows that any prejudice suffered by the defendant from such comments was not so substantial as to deprive him of a fair trial. The jury was not informed of the reasons for the defendant’s prior incarceration or his “prior dealings” with police. Further, unlike the situations in State v. Franklin, supra, and State v. Carter, supra, the references from the state’s witnesses in this case did not specifically relate to the defendant’s involvement in prior burglaries, robberies or unauthorized use of an access card. Thus, there were no comments about other offenses that would tend to persuade the jury to convict this defendant of the present charges based on his previous commission of similar crimes.
Additionally, the evidence in the record supports the jury’s finding that defendant committed the offenses of aggravated burglary, attempted armed robbery *1251 and unauthorized use of an access card. At trial, the state presented evidence showing that a short time after the burglary the defendant was found in the same white Jeep Cherokee that was used to commit the crimes. Three of the perpetrators testified that the defendant was involved in the aggravated burglary, armed robbery and unauthorized |1Kuse of Cascio’s credit cards. Mitchell testified that the defendant was the mastermind of the plan to rob the victim. Both Mitchell and Self stated at trial that the defendant pointed the gun at Cascio during the burglary. Miller testified that the defendant accompanied the group to Casio’s house, went to Wal-Mart with his co-defendants to use Cascio’s credit cards and later wiped a silver revolver with a shirt. Police found the items purchased with Cascio’s credit cards and the same type of handgun used in the crime at the house where defendant was known to stay and where he received mail. Thus, regardless of the vaguely prejudicial comments made at trial, the jury was provided with sufficient evidence to convict defendant of aggravated burglary, attempted armed robbery and unauthorized use of an access card. Accordingly, this assignment of error is without merit.

Sentencing

The defendant contends the trial court erred in imposing an indeterminate sentence. Defendant argues that the sentence imposed for his aggravated burglary conviction is indeterminate because the trial court initially sentenced him to 20 years at hard labor, but then stated that he was receiving a 25-year sentence.
A trial court is required to impose a determinate sentence. LSA-C.Cr.P. art. 879. When an appellate court determines that the trial court has imposed an indeterminate sentence, the sentence should be vacated and the matter remanded for re-sentencing. See State v. Robichaux, 43,259 (La.App.2d Cir.6/4/08), 986 So.2d 826.
Aggravated burglary is punishable by a term of imprisonment for at |1fileast one, but no more than thirty years at hard labor. LSA-R.S. 14:60.
At the time of sentencing, the trial court initially imposed a 20-year hard labor sentence for the defendant’s aggravated burglary conviction. However, moments later, the trial court stated that the sentence for aggravated burglary “is going to be 25 years at hard labor[.]” While the state argues that the trial court meant to impose the 25-year sentence, the transcript of the sentencing hearing does not provide any elucidation as to which sentence the trial court meant to impose. Consequently, the defendant’s sentence for aggravated burglary is indeterminate. Therefore, we shall vacate the sentence imposed for the aggravated burglary conviction and remand the matter to the trial court for resentencing.
CONCLUSION
For the aforementioned reasons, the defendant’s convictions are affirmed. In addition, the defendant’s sentences for attempted armed robbery and unauthorized use of an access card as theft are affirmed. The sentence imposed for defendant’s aggravated burglary conviction is hereby vacated and this matter is remanded to the district court so that a determinate sentence may be imposed.
CONVICTIONS AFFIRMED; SENTENCES FOR ATTEMPTED ARMED ROBBERY AND UNAUTHORIZED USE OF AN ACCESS CARD AS THEFT ARE AFFIRMED; SENTENCE FOR AGGRAVATED BURGLARY VACATED; REMANDED FOR RESENTENCING.

. Ms. Myers is referred to as Nicole Dickson in the bill of information and the trial transcript. However, Ms. Myers testified that she was never legally married to the defendant and that her name is Nicole Myers. Thus, she will be referred to as Nicole Myers in this opinion.